[No. 30973.    Department Two.    August 5, 1949.]

C. J. HAUGEN, *Appellant*, v. J. D. NEISWONGER *et al.*,
*Respondents.*[1]

*W. B. Magee,* for appellant.
*Edward Starin,* for respondents.

SCHWELLENBACH, J.—This is an appeal from a judgment
dismissing an action for rescission of a partnership agree-
ment because of alleged fraud. The action was brought
against a community of husband and wife; however, in
the course of this opinion we shall refer to the respondent

[1]Reported in 209 P. (2d) 267.

husband as if he were the sole defendant, since he alone represented the community.

Neiswonger was the owner of a farm located near Black Diamond, in King county. In the latter part of 1945, he acquired a small sawmill, which he established on his place. He operated the sawmill with more or less success for over a year. On Easter Sunday, 1947, Haugen and his wife were taken out there by Neiswonger's step-daughter. There is nothing in the testimony to show that this meeting was premeditated. Haugen was a carpenter living in Seattle. During dinner, Haugen stated that he had operated a mill in Idaho under a partnership agreement. After dinner, Neiswonger took Haugen out to show him his mill. Something was said about needing a partner to assist him in running the mill.

About a week later, Neiswonger and his wife went to Haugen's apartment in Seattle to see him, but he was not home. A few days later, they came back. After dinner, Neiswonger took Haugen out to his car. He asked Haugen if he would be interested in going into the mill business with him, and Haugen said he would think it over. A few days later, they came back again, and Haugen agreed to go out and look the place over. About three days after that, Haugen went out. It was agreed that Haugen would pay six thousand dollars for a half interest; two thousand dollars down, one thousand dollars in thirty days, and the balance at one hundred dollars a month.

The testimony is very sketchy as to what transpired during these negotiations. Mrs. Haugen testified that she heard Neiswonger say that he was "sure" her husband would get back everything he put into the business in a very short time, as the business was very good. Haugen testified that he told Neiswonger that he had been in the sawmill business in Idaho; also that when he inspected the mill he did not ask what it was worth. Neiswonger testified that he did not give Haugen an account of how much he had outstanding; that he did not show him the books and

records of the mill; that he did not give him a list of all the machinery and property in the mill.

At any rate, the following day the parties met at Auburn and went to an attorney's office, where an agreement was drawn up and signed. The agreement, as to its terms, was in accordance with the negotiations already had. Haugen then paid two thousand dollars and went out the next day.

In a few days it was decided that they needed a planer. They went to Everett, where they found one that cost $1,300. Neiswonger tried to raise the money, but was unable to do so, and Haugen paid for the planer. He said that he would take Neiswonger's share out of the $1,000 he owed as a payment on the partnership. Shortly thereafter, the loggers refused to bring any more logs until they were paid, and Haugen paid $278.45 for the logs. It is interesting to note that on May 9, 1947 (the date of the contract), Haugen paid $2,000 down; May 14, $1,300 for the planer; May 22, $278.45 for logs.

When these logs were milled, the loggers refused to deliver any more. Upon Haugen's refusal to pay for any more logs out of his own pocket, the mill consequently had to close down. Neiswonger demanded the $1,000 due under the contract, and Haugen said he had already paid that by paying for the planer and the logs. Haugen then left. Mrs. Neiswonger testified as to that occasion:

"Q. You say that Haugen came to the office where you were keeping the books? A. Yes. Q. State the conversation you had with Mr. Haugen at that time. A. Well, he was quite angry, and he said, 'I am ready to wash my hands of this deal.' And I asked him what was the matter. He said he wasn't making any money, and he said 'I am going to Seattle.' And I understood him to say 'I am going to see a lawyer.' But I asked him again, but he says, 'I am going to get myself— I am going to go into Seattle and get myself a job and go to work.' Q. Did he make any statement or any claim at that time that he had been defrauded? A. No, he didn't, Mr. Starin."

One of the principal grounds relied upon by appellant to sustain his allegations of false representations was re-

spondent's failure to disclose the existence of a certain chattel mortgage. The agreement provided:

"That said party of the first part herein hereby covenants and agrees to and with said party of the second part herein that said party of the first part has good title to said sawmill, complete, and every part thereof, and that there are no encumbrances whatsoever against the same."

On December 14, 1945, Neiswonger mortgaged to the Bank of Auburn one No. 2 American Sawmill located on his premises, as security for the payment of a promissory note given the same day in the amount of $750, with provisions for extensions or renewals up to $3,000. The mortgage was filed of record December 20, 1945, and was satisfied September 30, 1947. The contract of partnership was entered into May 9, 1947.

The trial court found:

"II. That prior to the 9th day of May, 1947, the defendant J. D. Neiswonger entered into negotiations with the plaintiff for the purpose of forming a partnership for the operation of said sawmill, and in connection with such proposed partnership the plaintiff and the defendant negotiated for the sale to and the purchase by the defendant of a one-half interest in and to the aforesaid sawmill business. That said negotiations were carried on fully and fairly by the parties at arm's length, and that no misrepresentations or false statements of fact were made by the defendants to the plaintiff in connection therewith."

█ One who has been induced by fraud to enter into a contract may rescind it. Fraud has been defined as follows:

"It may be laid down as a general rule that any false representation of a material fact, made with knowledge of its falsity and with intent that it shall be acted on by another in entering into a contract, and which is so acted on, constitutes fraud and will entitle the party deceived thereby to avoid the contract. False representations, not sufficient to sustain an indictment for false pretenses, may be sufficient to vitiate a contract thereby obtained. However, to entitle one to relief from his contract on the ground of fraud all the elements of fraud must exist, and where an essential element is absent one may not avoid his con-

tract on such ground. In determining whether or not there is fraud avoiding a contract, the representations made must be considered in the light of the attendant circumstances, such as the relation of the parties to each other and to the project at hand.

"While courts should be zealous in discovering fraud and compelling restitution, written contracts between parties dealing on a parity are not to be set aside without clear proof of fraud calling for judicial interference.

" 'Hard bargains.' The mere fact that one of the parties to a contract drove a hard bargain, or that there was inadequacy of price or consideration, will not in itself show fraud avoiding a contract, nor is an unprofitable·contract necessarily unconscionable, and the doing of that which one validly provides in his contract may be done cannot be pronounced as a fraud on his right, although such matters are factors for consideration and in combination with other circumstances may establish fraud vitiating the contract." 17 C.J.S. 505, Contracts, § 154.

Respondent was the aggressor in the transaction. His sawmill was encumbered. He was in danger of having his operations closed down because he could not pay for the logs unless he could obtain an "angel." His statement that appellant would get back everything that he put into the business in a short time was merely "sales talk," but he did know his financial condition. He did know that a one-half interest in the partnership was not worth $6,000. It is inconceivable that appellant would have entered into the partnership if he had known the facts. Under the circumstances, was it the duty of respondent to fully inform appellant?

██ The parties were dealing at arm's length. No fiduciary relationship existed between them. Appellant had been in the sawmill business. He knew, or should have known, its hazards. He made no effort to investigate the books or to investigate respondent's financial standing. The mortgage on the sawmill was a matter of public record. True, he was led into the transaction, but he was a willing victim. He saw what he thought was an opportunity to make some money. Under the circumstances, he had no

right to rely upon the representations or lack of representations of respondent.

In *Hurley v. Lindsay,* 105 Wash. 559, 178 Pac. 626, we said:

"Having in mind that, up to the time of entering into negotiations between the Lindsays and the Hurleys looking to a sale of the place, they were entire strangers to each other, and were dealing at arm's length; that the Hurleys, before purchasing the land, twice visited and thoroughly inspected it and became well acquainted with the location of its boundary lines upon the ground; that the land lies comparatively level, in a fairly compact body, and is capable of being viewed all over from near the house and barn; that the description in the deed accepted by the Hurleys is by metes and bounds, conforming strictly to those pointed out to the Hurleys by Mr. Lindsay upon the ground, and concludes with the words 'twenty acres of land more or less;' and that deceit and false representations and reliance thereon, such as are here invoked by the Hurleys, must be established by clear and convincing evidence to entitle them to recover, with the burden of proof resting upon them, we feel constrained to agree with the conclusion reached by the trial court, that the Hurleys were not misled to their prejudice in reliance upon any statement made by or in behalf of the Lindsays as to the number of acres in the farm."

The duty to disclose material facts is discussed in *Oates v. Taylor,* 31 Wn. (2d) 898, 199 P. (2d) 924, as follows:

"It will thus be seen that the duty to speak does sometimes arise when the parties are dealing at arm's length. That duty arises where the facts are peculiarly within the knowledge of one person and could not be readily obtained by the other; or where, by the lack of business experience of one of the parties, the other takes advantage of the situation by remaining silent. However, a party cannot be permitted to say that he was taken advantage of, if he had means of acquiring the information, or if, because of his business experience or his prior dealings with the other, he should have acquired further information before he acted."

In the present case, the appellant was misled by respondent's failure to disclose the existence of the chattel

mortgage on the sawmill. But the parties were dealing at arm's length. As a prudent man with some business experience in that field, it was incumbent upon appellant at least to search the public records. Had he done so, he would have not only discovered the unsatisfied mortgage in question, but, from the record there of previous mortgages on various properties of respondent, he would have been apprised of the precarious financial condition of his future partner. The appellant has failed to prove sufficient grounds to warrant rescission of the partnership agreement.

The judgment is affirmed.

JEFFERS, C. J., ROBINSON, SIMPSON, and GRADY, JJ., concur.

September 19, 1949. Petition for rehearing denied.