[No. 31642. Department One. August 10, 1951.]

R. E. GRAFF et al., *Appellants*, v. MAXINE F. GEISEL et al., *Respondents*.[1]

[1]Reported in 234 P. (2d) 884.

*Christ D. Lillions,* for appellants.

*Howard C. Graham* and *Elton B. Jones,* for respondents.

Finley, J.—Mr. and Mrs. Graff purchased the Utsalady Marina, a resort on Camano Island, Island county, Washington, on contract from Mr. and Mrs. Geisel. The Graffs brought this action in the superior court against the Geisels for rescission of the contract. Their basic contention in the trial court appears to have been that Mrs. Maxine Geisel induced them to purchase the Marina through false and fraudulent representations. They emphasized most strongly the following alleged representations by Mrs. Geisel: (1) That a franchise for the sale of Johnson outboard motors would be acquired by the Graffs with the purchase of the Marina; (2) that the franchise would be transferred to the purchasers after Mr. Graff took a course of instruction relative to the sale and servicing of the Johnson motors; and (3)

that such a course could be obtained by Mr. Graff through the Johnson motors area distributor. Actually, the alleged course was not available. The Graffs did not qualify for the franchise. It was never transferred to them.

At the conclusion of the plaintiffs' case, the trial court granted a motion by the defendants, dismissed the action *with prejudice,* and entered judgment to that effect. The Graffs have appealed.

We now outline the facts at some length and in considerable detail, as we see them from the evidence presented. It appears that the Utsalady Marina was owned and operated by the Geisels for some time prior to its sale to the Graffs. The Marina sold and repaired boats and outboard motors, sold sporting equipment, gasoline and oil, and operated a very small luncheon counter. Under the Geisels' management, approximately *two thirds of the physical area* was devoted to the sale and service of outboard motors.

The Geisels listed the Marina for sale with certain real-estate agents. Through a realtor, the Graffs learned about and investigated the purchase of the Marina. It should also be mentioned parenthetically that the Graffs were not entirely lacking in business experience, as they had operated a filling station for three and a half years prior to their purchase of the Marina. They made three trips to the Marina: one in May, 1949, one on June 12, 1949, and one on June 15, 1949, in connection with their negotiations to purchase.

During the first visit, the Graffs met Mrs. Geisel. She allowed them to examine the Marina. During the second visit, the sellers' real-estate agent was also present. She did substantially all of the talking for the sellers on this occasion. The Graffs were accompanied by their accountant on the third visit. Apparently, there was no discussion of the purchase of the Marina with Mr. Geisel. It should be noted that during the first and third visits, Mrs. Geisel exhibited the Marina to the Graffs and pointed out its attractive features. The Graffs were furnished pertinent information as to the gross receipts of the Marina for the years prior to their visits. Their accountant was allowed to examine the

state sales tax returns for the years 1947 and 1948. The Graffs' accountant advised them to purchase the Marina. The transaction was completed by means of a written contract, dated July 19, 1949.

Certain provisions from the contract are now quoted as follows:

"4. The Johnson contract now made out to Les Geisel's Utsalady Marina, which contract is renewable annually, shall be continued under said name until such time as Purchasers shall qualify as agents. Purchasers shall be allowed to purchase any motors and accessories pursuant to the terms of said Johnson contract, and shall at all times observe and abide by the terms, covenants and conditions of said Johnson contract. Merchandise bought from the Johnson distributor shall be paid for by the Purchasers immediately according to the terms and demands of said distributor.

"5. That the Seller shall not individually or in conjunction with others, directly or indirectly enter into a business competing with the Purchasers on Camano Island during the period the Purchasers conduct the present business being carried on on the premises herein sold; Provided, however, if the Purchasers discontinue any part of said business, seller may engage in that part or similar business at any place or time."

Prior to July 19, 1949, the contract date, although appellants talked with two of respondents' wholesale suppliers, they did not talk with anyone in the firm of Pacific Marine Supply Company, of Seattle, the area distributor for the Johnson motors, regarding the contemplated transfer of the franchise from respondents to appellants. Subsequent to July 19, 1949 (the contract date), and before the first of September, 1949, appellants made somewhat extensive alterations in the Marina. They transferred the outboard motor shop from its original location to a garage in the rear of the Marina. Where this shop had been, the appellants installed shelving for a grocery store. All window display signs relating to outboard motors were removed.

Apparently, the franchise for the sale of Johnson outboard motors was considered an important factor in the business operations of the Marina. As noted above, this franchise was obtained from the Pacific Marine Supply

Company. Such franchises were given only to individuals with certain qualifications. They were not allocated to a specific geographical area; that is, an area or location might have one or more dealers or franchise holders, depending upon the demand for the product therein.

During the preliminary negotiations respecting the sale of the Marina, respondent Maxine F. Geisel talked with appellants concerning the transfer of the Johnson franchise from respondent Leslie A. Geisel to the appellants. She indicated that the appellants should communicate with the Pacific Marine Supply Company of Seattle, and allegedly suggested that one of the purchasers should arrange to take a short course of instruction there. This supposedly covered the sale and servicing of Johnson motors, was important in qualifying for a dealership, and could be obtained through the area distributor. The testimony for appellants relative to the statements of respondent Mrs. Geisel, pertaining to the Johnson motor franchise, was in part as follows:

*Witness Warren Lind*: "She [Maxine Geisel] told us at that time [appellant's first visit] that we would have the Johnson agency; that it would stay with the Marina."

*Witness LaVerne Graff*: "She [Mrs. Geisel] said we would have to take the training course to get the franchise, so to protect the franchise for us Mr. Geisel would take out the new one in September and then in the future we could get it and take the training course. They would turn the new franchise over to us."

*Witness Leonard Hutchinson* (appellant's accountant):

"Q: Do you recall whether any discussion was had concerning Mr. Graff's ability to hold a franchise? A: Yes. Q: For sale of Johnson Motors? A: Mrs. Geisel did not seem at all concerned about his ability to hold that contract. She mentioned that he would have to take a course in the repair of the outboard motors but she laid very little emphasis on that point and it apparently was something that was just a matter of the time that he would have to spend in learning that part of it. Apparently, no trouble was anticipated. . . . Q: Did you discuss the question of the franchise of the Johnson Outboard Motors? A: No. That contract

was offered for sale and as far as I was concerned it is the lawyer's duty to check that and not mine."

At one stage in the negotiations, the Graffs contemplated a partnership with Warren Lind (Mr. Graff's brother-in-law) in the purchase of the Marina. When questioned as to whether Mrs. Geisel mentioned that there would be any difficulty in transferring the Johnson motor franchise, Lind testified, apparently with reference to appellants' first visit to the Marina:

*"At that time we didn't go too thoroughly into that.* It was the *second trip* that we really could talk things over and be more businesslike about it." (Italics ours.)

But, in speaking of the *second trip* by the appellants to the Utsalady Marina, appellant R. E. Graff testified:

*"I don't believe Mrs. Geisel said anything. Mrs. Thomas* [the real-estate agent] *did all the talking,* you might say, at that particular time. She did mention the fact that whoever went in there would do well with Johnson Motors and repair service and with all the additional sidelines, it was a sure thing, and that Johnson Motors, being one of the better known motors, that certainly would be an added incentive for anybody to own the place." (Italics ours.)

With respect to the second trip, appellant LaVerne Graff stated:

*"We didn't get to talk too much* to Mrs. Geisel at that time. We were talking more with the real estate lady and looking over the place again. Mrs. Geisel was busy." (Italics ours.)

During the early part of September, 1949, appellants for the first time discussed the franchise with the distributor and learned that no course or training plan was being conducted by the company, and that appellant R. E. Graff was not qualified to hold the franchise for Johnson outboard motors. After learning this, appellants regularly made four regular monthly payments of two hundred fifty dollars each on the contract of purchase. Apparently payments were then stopped, and thereafter consideration was given to rescission of the contract.

From the latter part of November, 1949, respondents carried on a retail business of selling Johnson outboard motors in East Stanwood, Washington. Although this community is not on Camano Island, it is within the same trading area as the Utsalady Marina. Respondent Leslie Geisel testified as an adverse witness that it was necessary for him to open this shop in order to retain the Johnson outboard motor franchise; that appellant R. E. Graff wanted him to open the shop; that appellants could purchase Johnson products from him at wholesale prices.

■ It would appear that appellants contend that it was error for the trial judge *to weigh* the evidence at the conclusion of their case. But, as pointed out by the respondents, the case was equitable in nature and was tried to the court without a jury. Where this is the case, such a contention is without merit. In *May v. Roberts,* 128 Wash. 538, 540, 223 Pac. 590 (a law action—malicious prosecution), we said:

"The argument seems to be that, at that time, the evidence ought to have been viewed as though the case were being tried before a jury and the case not then disposed of with reference to those defendants, if there was any evidence tending to support plaintiffs' claim of damages as against them . . . The case before us, as has already been noticed, was being tried before the court; so at the close of the plaintiffs' evidence it was not a mere question of a nonsuit in the conventional sense as upon a jury trial, but was a question of *the weight of the evidence,* as much so as if both parties had rested at that time . . . Plainly, therefore, the trial court was not, upon disposing of the defendants' motion for dismissal and judgment at the conclusion of the plaintiffs' evidence, required to view the evidence in the circumscribed manner required in disposing of such a motion upon a jury trial." (Italics ours.)

See, also, *Fisher v. Hagstrom,* 35 Wn. (2d) 632, 642, 214 P. (2d) 654 (an equity action to quiet title).

■ Now, as to whether the trial court erred in dismissing appellants' action *with prejudice*: First, let us make it clear that the point here involved is the prejudicial aspect of the dismissal. It is the finality of the dismissal, the fact they cannot commence their action again, to which appellants

take exception, But once again we point out that the case here on appeal was equitable in nature and was tried by the court without a jury. We have distinguished between mo-. tions to dismiss in law and in equity. In an action at law, a judgment based on a motion to dismiss or for nonsuit will not act as a bar to subsequent action by the plaintiff. *Linton v. State,* 185 Wash. 97, 52 P. (2d) 1239. In an equity action, on the other hand, it is proper to dismiss with prejudice. In ruling on a similar contention in *United States Fidelity & Guaranty Co. v. Western Seafood Co.,* 190 Wash. 200, 204, 67 P. (2d) 892, we said:

"It being triable in equity, it was immaterial whether the motion made at the conclusion of the appellant's evidence was for a nonsuit or a challenge to the sufficiency thereof.

"In *Michel v. White,* 64 Wash. 341, 116 Pac. 860, it was said:

" 'This court has frequently said that a motion for a nonsuit had no place in equity causes, and whenever we have been called upon to review one, we have treated it as a motion to dismiss. [Citing authorities.]' "

We find no merit in this contention.

 Turning now to the substantive questions involved on this appeal, we may at the outset take note of the fact that appellants' brief cites a number of cases involving the theory of substantial failure of consideration, as a ground for rescission of a contract. However, their case was presented in the trial court on the theory of misrepresentation and fraud as the basis for rescission. The oral decision of the trial judge shows he considered the case on that basis. He said: "Fraud is never presumed, but must be proven by clear, cogent, and convincing evidence."

In *West Side Telephone Co. v. Kenison,* 147 Wash. 542, 545, 266 Pac. 706, we stated:

"An examination of the record clearly indicates that the case was presented, tried and determined on the theory of fraud, collusion and conspiracy, and we think it is the settled law of this state that the case will be considered in this court upon the same theory upon which it was presented in the trial court."

In view of the foregoing, any discussion of substantial failure of consideration as a ground for rescission of the contract would not be in order here.

To substantiate their claim of fraud based upon misrepresentation, the appellants rely upon (1) certain statements relating to respondents' intention to terminate their business activities in Island county and to move to Yakima, Washington; and (2) certain other statements made by Mrs. Geisel relating to the transfer of the Johnson motor franchise.

Any statements relating to respondents' intention to move to Yakima do not appear to be material under the reasoning of *Webster v. Romano Engineering Corp.*, 178 Wash. 118, 121, 34 P. (2d) 428, as follows:

"The representation must relate to an existing fact. Speaking of this point, in *Tacoma v. Tacoma Light & Water Co.*, 16 Wash. 288, 305, 47 Pac. 738, we said:

" 'It [the representation] did not relate to a *past transaction* nor was it the statement of an existing fact. It was a mere estimate of what they would do in the future, and fraud cannot be predicated upon it.'

"See, also, *Stewart v. Larkin,* 74 Wash. 681, 134 Pac. 186, L.R.A. 1916B, 1069."

The statements allegedly made by respondent Maxine Geisel with respect to the transfer of the Johnson outboard motor franchise to the appellants require more detailed consideration, at least if we assume that they were statements of fact and not mere expressions of opinion. In this connection, we attach considerable significance to the opinion of the trial judge, who observed the witnesses. In the recent case of *Cloakey v. Bouslog, ante* p. 66, 234 P. (2d) 880, we pointed out:

"With notably few exceptions, we affirm trial courts on the issue of whether fraud has been established, because the question is determined on the basis of which witnesses the trial court believes."

In the present case, the trial judge had this to say on the point at issue:

"But it is undisputed that they were informed that the Geisels had a franchise; that in order to carry these motors on their own responsibility they had to get a franchise from this agency in Seattle. There was no misinformation given unless it was from talk by Mrs. Geisel to the effect that it wouldn't be difficult for them to qualify. That's the most you can say as to anything she said which perhaps wasn't true.

"But certainly, people dealing at arm's length and intelligent people, as the plaintiffs appeared to be, certainly weren't justified in relying upon that as a guarantee that they would get a franchise from the manufacturer or the manufacturer's representative. Indeed, they were put on notice. They were told who the agency was. It seems to me the least amount of care would have required them to make further inquiry of this agency about getting a franchise."

The above views of the trial judge are supported by the reasoning in *Weir v. School Dist. No. 201*, 200 Wash. 172, 178, 93 P. (2d) 308, 123 A. L. R. 1057. In the *Weir* case, the trial court found that appellant made false representations which induced respondent in that case to enter into a contract with appellant. In holding that respondent *had no right to rely* on the representations and thus reversing the decision of the trial court, we held:

"We are aware that the tendency of the modern decisions is to restrict rather than to extend the rule requiring diligence on the part of the injured party and similar rules such as *caveat emptor*. 26 C. J. 1144 § 59. This court has frequently noted this trend of decision and has aligned itself with that policy. *Wooddy v. Benton Water Co.*, 54 Wash. 124, 102 Pac. 1054, 132 Am. St. 1102; *O'Daniel v. Streeby*, 77 Wash. 414, 137 Pac. 1025, L.R.A. 1915F, 634; *Duffy v. Blake*, 80 Wash. 643, 141 Pac. 1149; *Bliss v. Clebanck*, 136 Wash. 32, 238 Pac. 979.

"But in these later cases, it is to be noted that there was a false assertion of an existing fact, usually with reference to property, the truth of which fact was *peculiarly within the knowledge* or *means of knowledge of the declarant*; or the property was at a distance and the *opportunity of ascertaining the true fact was not readily at hand*; or the misrepresentation was made for the purpose of preventing an investigation and ascertainment of the true fact; or the declarant knew that the other party did not intend to make

a personal investigation, but relied solely on the truth of the fact communicated by the declarant. *Stewart v. Larkin,* 74 Wash. 681, 134 Pac. 186, L.R.A. 1916B, 1069." (Italics ours.)

▌ The standard basic definition of fraud is set out in *Gray v. Wikstrom Motors,* 14 Wn. (2d) 448, 455, 456, 128 P. (2d) 490:

"The elements necessary to establish fraud are: (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity; (5) his intent that it shall be acted upon by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom the representation is addressed; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; and (9) his consequent damage."

Certain apparent refinements of the above definition seem worthy of mention here as applied in the cases discussed hereafter. In *Bliss v. Clebanck,* 136 Wash. 32, 238 Pac. 979, we stated in effect that, although a vendee to whom representations of material facts are made may have an opportunity of ascertaining their truth for himself, ordinary prudence and diligence do not require him to do so where the facts (a) were peculiarly within the knowledge of the vendor, (b) were not known by the vendee, (c) could not be ascertained readily by the latter; and where the vendor intended that the representations should be acted upon by the vendee. In *Oates v. Taylor,* 31 Wn. (2d) 898, 904, 199 P. (2d) 924, we suggested that lack of business experience of the vendee was a factor to be considered, but indicated that a vendee

" . . . cannot be permitted to say that he was taken advantage of, if he had means of acquiring the information, or if, because of his business experience or his prior dealings with the other, he should have acquired further information before he acted."

See, also, *Walsh v. Bushell,* 26 Wash. 576, 67 Pac. 216 (1901), and *Haugen v. Neiswonger,* 34 Wn. (2d) 422, 209 P. (2d) 267.

In *Salter v. Heiser,* 36 Wn. (2d) 536, 219 P. (2d) 574, we mentioned the factor of lack of business experience and

emphasized the fact that the vendors and vendees were members of the same fraternal order, which, coupled with other facts, suggested that the vendees were put off their guard. In that situation, we held that they had a right to rely upon the representations of the vendors.

With the comments on the above cases in mind, we now summarize and interpret the facts in the case at bar as follows:

Appellants were not so entirely lacking in business experience that they were placed at a disadvantage and justified in relying upon the alleged representations of respondent Mrs. Geisel. Actually, they had been engaged in the gasoline service station business for several years. They should have known that the transfer of gasoline franchises must be cleared with the particular gasoline company or distributor involved, and that they are not transferred "willy-nilly" by individual, independent gas station owners or operators' without clearance or authorization from the particular company. This should have stirred appellants' curiosity as to the Johnson motors franchise and have prompted some inquiry of the distributor.

Appellants sought and obtained the advice of their accountant. He made an investigation of the proposed purchase which apparently satisfied him. He advised the Graffs to purchase the Marina. Appellants also had the benefit of the services of an attorney in drafting the contract of purchase. The provisions of the contract itself should have indicated that there was some formality necessary in transferring the franchise besides the good-will and acquiescence of the respondents.

Mrs. Geisel clearly indicated that some contact with Pacific Marine Supply Company, the distributor, was required. The facts as to transfer of the franchise were certainly not peculiarly within her knowledge. Appellants could have readily ascertained the facts simply by a telephone call to the distributor.

The fact that appellants moved the location of the outboard motor shop and converted the substantial amount of

space it had occupied into a grocery store, and the further fact that the signs advertising Johnson outboard motors were taken down and removed (although at the time appellants could, under the contract of purchase, procure motors, parts, service, and repairs through Leslie Geisel), indicated some possible lack of interest by appellants in the outboard motor portion of the Utsalady Marina business and the importance of its profit potential. We are not convinced that Mrs. Geisel was aware of the falsity of the allegedly fraudulent misrepresentations attributed to her. Assuming that the statements allegedly made by respondent Maxine Geisel were false, we believe appellants had no right to rely on them.

Prior to their execution of the contract, ordinary diligence and prudence should have prompted them to question the Pacific Marine Supply Company respecting the Johnson motor franchise. We note in this connection that they did communicate with and secure information from two other wholesale suppliers of respondents. If their interest in the Johnson motor franchise at that time had been as acute as now alleged in this litigation, very little investigation of the matter would have protected them adequately.

Finally, we are impressed with the fact that appellant R. E. Graff made monthly payments of two hundred fifty dollars on the purchase contract on October 7, November 7, December 8, 1949, and again on January 9, 1950,— after he learned that he could not qualify for the Johnson motor franchise. As to this latter aspect of the matter, we said in *Weir v. School Dist. No. 201,* 200 Wash. 172, 180, 93 P. (2d) 308, that:

"One who seeks to avoid a contract, which he has been induced to enter into by fraudulent representations of another touching the subject matter of the contract, must act with reasonable promptness on discovering the fraud, or the right to rescission will be waived. *Blake v. Merritt,* 101 Wash. 56, 171 Pac. 1013; *Kellner v. Rowe,* 137 Wash. 418, 242 Pac. 353; *Stubbe v. Stangler,* 157 Wash. 283, 288 Pac. 916; *Depositors Bond Co. v. Christensen,* 185 Wash. 161, 53 P. (2d) 312."

■ In our opinion, appellants had no right to rely upon the alleged representations of Mrs. Geisel. The fraud alleged by appellants has not been established by clear, cogent, and convincing evidence. *Schulz v. Spokane United Rys.*, 16 Wn. (2d) 43, 47, 132 P. (2d) 366.

■ In closing, we note appellants' contention that their written demand upon respondents to produce "tax returns" required production of respondents' Federal income tax returns, and that the trial court erred in ruling that their demand was limited and only required the production of Washington state tax returns. But we need not decide the point, for, even if the trial court's ruling was incorrect, the error committed was not prejudicial. Appellants had ample opportunity to secure the particular information when respondent Maxine Geisel, testifying at their behest, said that she could obtain it from her accountant during a noon recess and present it. Thereafter, appellants made no further reference to or demand for such tax information, and it would appear that their interest in the matter was terminated. This contention is consequently without merit.

The judgment of the trial court is affirmed.

SCHWELLENBACH, C. J., BEALS, HILL, and DONWORTH, JJ., concur.

---

October 3, 1951. Petition for rehearing denied.