630

[No. 36366.    Department One.    March 14, 1963.]

HIDEO MORI et al., *Respondents*, v. SALVATORE T. COVELLO,
*Appellant.**

*Wettrick, Toulouse, Lirhus & Hove,* by *Ralph C. Hove,*
for appellant.

*Koenigsberg & Brown,* for respondents.

HUNTER, J.—This is an appeal from a judgment awarded
to the plaintiffs, Hideo Mori and Kimiko Mori, husband
and wife, against the defendant, Salvatore T. Covello, by
reason of false representations in the sale of a house and lot.

In the late fall of 1958, the defendant (appellant) com-
menced building a dwelling for his residence in Seattle.
The lot on which it was being constructed required a fill
in the rear, northeast corner of the lot which resulted in
a steep embankment of earth and rock about 20 feet in
height. To retain the bank a 6 or 7-foot bulkhead of logs
placed lengthwise was built up from the base of the fill.
The porch in the rear of the dwelling extended nearly to
the edge of the east embankment.

*Reported in 379 P. (2d) 727.

The house was occupied by the defendant in January, 1958. In August, 1958 the house and lot were sold to the plaintiffs (respondents). During the rainy season in November of that year, the bulkhead gave way causing approximately 100 yards of debris to slide onto the adjoining property of a neightbor, Mrs. McConnaughy. The plaintiffs were required to remove the debris and were directed by the city to build a satisfactory retaining wall. A rock retaining wall was constructed by the plaintiffs, and, when the defendant refused to reimburse the plaintiffs therefor, this action against the defendant was commenced. The case was tried before the court without a jury.

The court entered finding of fact No. VII, as follows:

"That before entering into said purchase agreement and before purchasing the above-described property and home, the defendant did represent that the log wall would hold, and did represent that said retaining wall had been passed by the City Building Department Inspector and that the plaintiffs had nothing to worry about; that the defendant at the time that he made the said representations should have known that they were false and that he made the said representations recklessly for the purpose of inducing the plaintiffs to purchase the real property and the dwelling house thereon; that the said plaintiffs did rely upon said representations and were induced thereby to make the said purchase; that the plaintiffs did not know the falsity of the defendant's representations and would not have purchased the said home had they been aware of the falsity of said representations."

and conclusions of law Nos. I and II:

"I. That there is actionable misrepresentation which damaged the plaintiffs herein in the sum of $2,068.00.
"II. That plaintiffs are entitled to judgment against the defendant Salvatore T. Covello in the sum of $2,068.00."

This appeal followed.

The defendant contends there is no actionable fraud because there is no clear, cogent and convincing evidence in the record to support the trial court's finding of fact No. VII, and conclusions of law Nos. I and II, *supra*. The rule which is applied to show actionable fraud is not disputed;

the defendant relies on our oft-repeated statement that it is necessary to prove each of the nine essential elements of fraud by clear, cogent and convincing evidence, citing *Haagen v. Landeis*, 56 Wn. (2d) 289, 352 P. (2d) 636 (1960) and *Graff v. Geisel*, 39 Wn. (2d) 131, 234 P. (2d) 884 (1951).

▪ We are satisfied that finding of fact No. VII and conclusions of law Nos. I and II contain the nine essential elements of fraud. The defendant has not argued, on this appeal, that the element of damages contained in conclusions of law Nos. I and II is erroneous in the event the other elements of fraud are established. Therefore, the sole issue with which we are confronted is whether those elements of fraud contained in finding of fact No. VII are supported by clear, cogent and convincing evidence.

In making this determination, we need only consider the evidence most favorable to the plaintiffs. *Shultes v. Halpin*, 33 Wn. (2d) 294, 205 P. (2d) 1201 (1949). We find this evidence to be as follows:

Mr. Mori observed the embankment in the rear of defendant's house immediately prior to the purchase of the defendant's house and lot in July, 1958. The following conversation took place, to which Mr. Mori testified, on direct examination, as to the plaintiffs' examination of the premises and as to the representations of the defendant:

"Q Did you on any of these occasions see any wall either on the north or east side of the property? A Yes, we went on the back of the house, on the east side, and examined there, and I asked Mr. Covello about the slope, or retaining wall that he had on that east side of the house, and I asked him if it would hold or not, and Mr. Covello said, 'Well, this has been passed by the City Building Inspector,' and I had nothing to worry about."

Again, on cross-examination, he testified:

"Q What did you do when you came back that time? A We looked at the back of the house, and also the retaining wall. I asked Mr. Covello if the dirt would hold up, and Mr. Covello said the retaining wall had been inspected by the City Building Department Inspector, and that I had nothing to worry about."

Mrs. Fredlund, a friend and business adviser of the plaintiffs, testified to the following conversation with the defendant in the escrow office as to the representations of the defendant:

"Q Now, what was said at the escrow office between Mr. Mori and Mr. Covello? A When they came into the escrow office—I talked to Mr. Mori, whether it was safe there, the logs there. . . . A Then he came down, and we sat down and I asked if I could ask Mr. Covello a question, if it was safe, and he said, 'Yes. *I have built lots of houses, and the logs will not slide, because it was built on solid rock. I built it for myself, and things have come up and I have to sell it. . . .* Q Did Mr. Covello state that the retaining wall had been approved by the building department? A That is what he said. . . ." (Italics ours.)

Mrs. Mori testified as to the representations of the defendant and the reliance thereon by her:

"Q—about the east bank? A Yes, my husband was asking him, talking to him. Q What did your husband say? A He say, 'Is this all right?' something like that. Q What did Mr. Covella say? A Everything okay and passed by city inspectors so nothing to worry about anything. . . . Q Mrs. Mori, if Mr. Covello did not tell you that everything was approved and you don't have anything to worry about would you have agreed to buy that property? A No."

Mrs. McConnaughy, the neighbor to the east of the plaintiffs, testified, on direct examination, as to the defendant's knowledge regarding the insecurity of the bulkhead:

"Q What was the first conversation that you had with him in reference to this steep east bank of the Mori property? A Well, I said I wasn't very sure of that hill; it wasn't very safe. . . . Q What was the date when you had the first conversation with him? A Well, I would not remember the date of it. Q . . . What was he doing in reference to this east hill, or what was he doing on the bank? A Well, he put in some logs on the bank."

On cross-examination she testified as follows:

"Q Mrs. McConnaughy, you stated that there were two slides? A Yes. Q Do you recall exactly when the first one occurred? A I don't remember the date. Q Was it in 1956? A I don't remember that. I figured it was not my business.

Q Did it occur prior to the time Mr. Covello actually moved into the house? A Yes; he was in the house when the logs fell down."

Mr. Donald L. Archer, a neighbor to the north, who could view the property from his home, testified as to the defendant's knowledge regarding the insecurity of the bulkhead:

"Q Do you recall any slide or any dirt breaking over the log wall? A Yes, when they first bulldozed there was some come over, but that could happen, I mean, with a bulldozer bulldozing the dirt up on it like that. Q Were there any additional logs placed on that wall? A Well, now, I am not sure about that. I suppose there was replaced, I never seen any replaced. . . . Q After the bulldozing was completed do you recall of any instance when the dirt broke through the log retaining wall? A Yes, the first winter. Q The first winter after the house was started? A Yes. Q What happened at that time? A Well, the logs busted and dirt went down. Q Were those so-called busted logs replaced? A Yes."

The testimony most favorable to the plaintiffs which Mr. Taylor, the Seattle building inspector, gave regarding a conversation between him and the defendant on December 15, 1958, is as follows:

"Q Did you ever in connection with that bank have any conversation with Mr. Covello, the owner then of the property? A Yes. Q What was your conversation, and please tell us as best you can remember about the date. You may use any notes that you have, if you have any. A Well, it was on a general-cover call, when we go to see if the framing is complete for the plasterboard. I asked him then what he planned to do with the bank, and he said he had some logs stuck into the bank, and he thought it would hold; and I told him at the time it might be all right; I was not sure, but if it did not, he would have to fix it more adequate. Q When was that? A That was before the house was constructed. Q Before the house was constructed? A That was during the construction of the house, when the framing was in. Q Did you have any further conversation with him? THE COURT: What did he say in the first conversation? He said he had logs in the bank, and you said what? THE WITNESS: I said I didn't think it was a very good way to retain the wall; if it failed, he would have to fix it more adequately. . . . Q Mr. Taylor, counsel has said that you

testified that you thought whatever was there would hold. I didn't understand you. A  I didn't say I thought it would hold. I said I didn't think it was a very good retaining wall, and if it didn't hold, he would have to fix it up properly. . . .  Q  Did you approve it? A  Well, I let it go as it was, yes. It was not a vital part of the inspection at the time. I was more interested in the house itself. Q  Did you make any inquiry as to whether or not there had been any slides there at the time you came out to look? A  No, sir.  .  .  . Q  If you had known that there had been some slides there, would you then have demanded that he put up a retaining wall? A  Yes."

We are of the opinion that finding of fact No. VII is supported by clear, cogent and convincing evidence. From the record, as set forth above, the trial court was entitled to conclude that the defendant knew the log bulkhead had broken on two occasions either in the early days of the construction of the house or during the defendant's occupancy thereof; that the log bulkhead was substantially the same at the time of the conversation with the plaintiffs as at the time of the two prior slides; that this was known to the defendant but not to the plaintiffs; that the statement that the plaintiffs had nothing to worry about was falsely and recklessly made; further, that the conversation with the Seattle building inspector constituted, at the very most, a contingent approval, based upon the condition that the log bulkhead would hold; that, at the time of the defendant's conversation with the plaintiffs, the defendant knew the logs had not held and, under these circumstances, the statement that the building inspector had approved the log bulkhead was a false representation to the plaintiffs; and, therefore, that the plaintiffs were entitled to conclude from the defendant's representations that the log wall would hold and were justified in relying upon such representations which were peculiarly in the knowledge of the defendant; that the plaintiffs would not have purchased the defendant's property had they known of their falsity; and that the cost of constructing a suitable retaining wall constituted damages flowing from actionable misrepresentations.

The record supports the findings of the trial court. The judgment entered thereon is affirmed.

OTT, C. J., HILL, ROSELLINI, and HALE, JJ., concur.