[No. 40141-0-II.   Division Two.   June 1, 2011.]

MICHAEL ANNECHINO ET AL., *Appellants*, v. MICHAEL C. WORTHY ET AL., *Respondents*.

*Michael E. Withey* (of *Law Offices of Michael Withey*) and *Derek J. Vanderwood*, for appellants.

*Stephen G. Leatham* (of *Heurlin Potter Jahn Leatham & Holtmann*), for respondents.

¶1 ARMSTRONG, J. — When the State closed the Bank of Clark County (Bank), Michael and Theresa Annechino discovered that approximately $500,000 of their deposits was not insured by the Federal Deposit Insurance Corporation (FDIC). The Annechinos sued the Bank and several individual officers and employees for breach of a fiduciary duty. The Clark County Superior Court dismissed the claims against the individual defendants on summary judgment. On appeal, the Annechinos argue that the Bank's officers and employees established a quasi-fiduciary relationship with them and are personally liable for breaching that duty. Because the Annechinos have failed to establish that the individual defendants entered into a fiduciary relationship with them, we affirm the summary judgment order.

## FACTS

¶2 In October 2008, the Annechinos decided to transfer their savings from Charles Schwab to the Bank because they had learned that their Schwab deposits would not be fully insured if Schwab failed. Before transferring the funds, the Annechinos wanted to ensure that their deposits would be fully FDIC insured. Michael[1] spoke to Michael Worthy, the chief executive officer of the Bank, and exchanged several e-mails with Kelli Reynolds, a financial services officer at the Bank, expressing this concern.

¶3 Reynolds prepared a chart recommending that the Annechinos spread their deposits over seven accounts to provide $3 million in FDIC coverage. She copied Worthy and Joan Cooper, her supervisor, on her e-mail communications with Michael. Michael reviewed the chart and suggested putting one of the accounts in the name of the family trust. He also negotiated a higher interest rate on his deposits. The Annechinos then transferred $1.85 million to the Bank, bringing their total deposits to $3 million.

---

[1] We refer to the appellants by their first name but intend no disrespect.

¶4 Reynolds asserts that she never personally assured Michael that his deposits would be fully FDIC insured; rather, she claims that she recommended he review the FDIC rules to verify for himself, or have his accountant verify, that his deposits would be fully insured. Michael counters that Reynolds never told him to review the FDIC rules or to independently verify that his deposits would be fully insured.

¶5 In January 2009, the State closed the Bank and appointed the FDIC as receiver. The FDIC determined that approximately $500,000 of the Annechinos' deposits were uninsured and issued receivership certificates for the uninsured amount. After learning that the FDIC was withholding a portion of the Annechinos' deposits, Reynolds reviewed her recommendation chart and found no errors. Assuming, therefore, that she must have misinterpreted the FDIC rules, she wrote a letter to the chief financial officer of the Bank explaining the Annechinos' situation and stating:

> It is unfortunate that my interpretation of coverage was not accurate and I am regretful that my expertise was not sufficient to protect our client who trusted us to protect their interests, and seek any options we make [sic] have at our disposal to right this wrong.

Clerk's Papers at 76, 179.

¶6 Worthy and Reynolds later learned that due to an error, the Annechinos' funds were not deposited according to Reynolds's recommendations. When Michael requested that one of the accounts be put in the name of the family trust, Reynolds had suggested changing account 12009528 to a trust account, but the Bank accidentally changed account 12009536 instead. Consequently, funds in excess of FDIC insurance were deposited into the 528 account. Although the Annechinos received monthly statements showing which funds were deposited into which accounts, neither they nor the Bank noticed the error. The parties dispute whether the Annechinos' funds would have been

fully FDIC insured but for the Bank's error in changing the wrong account to a trust account.

¶7 The Annechinos sued Worthy, Reynolds, Cooper, Umpqua Bank (the successor in interest to the Bank), and the Clark County Bancorporation. The individual defendants moved for summary judgment, arguing they could not be held personally liable for the Annechinos' loss. The trial court granted their motion and dismissed the claims against Worthy, Reynolds, and Cooper.

## ANALYSIS

### I. Standard of Review

¶8 We review summary judgment orders de novo. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). We will affirm an order granting summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Ranger*, 164 Wn.2d at 552.

### II. Fiduciary Duty

¶9 The Annechinos argue that the critical issue before us is whether Worthy and Reynolds established a quasi-fiduciary relationship with them when they sought assurances that their deposits would be fully FDIC insured and relied on Worthy and Reynolds's superior knowledge to structure their accounts accordingly.[2] They rely primarily on *Liebergesell v. Evans*, 93 Wn.2d 881, 613 P.2d 1170 (1980), *Tokarz v. Federal Frontier Savings & Loan Ass'n*, 33 Wn. App. 456, 656 P.2d 1089 (1982), and *Hutson v. Wenatchee Federal Savings & Loan Ass'n*, 22 Wn. App. 91, 588 P.2d 1192 (1978). Worthy and Reynolds counter that none of the Annechinos' authorities supports holding bank officers and

---

[2] The Annechinos do not include Cooper in this or any of their other arguments concerning personal liability. Accordingly, we affirm the trial court's order dismissing the Annechinos' claims against Cooper without further discussion.

employees personally liable for breaching a fiduciary duty to a bank customer. We agree.

¶10 As a general rule, participants in a business transaction deal at arm's length and do not enter into a fiduciary relationship. *Liebergesell*, 93 Wn.2d at 889. The rule applies to transactions between a bank and a depositor. *Tokarz*, 33 Wn. App. at 458-59. But special circumstances may establish a quasi-fiduciary relationship in fact where one would not normally arise in law. *Liebergesell*, 93 Wn.2d at 890; *Tokarz*, 33 Wn. App. at 459; *Hutson*, 22 Wn. App. at 102-03.

¶11 For example, in *Liebergesell*, our Supreme Court considered whether special circumstances established a fiduciary relationship between a borrower and a lender where a businessman induced a widowed school teacher to lend him money at a 20 percent interest rate, even though he knew that interest rates over 12 percent were illegal. *Liebergesell*, 93 Wn.2d at 884-85. The lender, in contrast, had no business expertise, considered the borrower a friend, and relied on him for financial advice. *Liebergesell*, 93 Wn.2d at 884-85. But when she attempted to collect the unpaid interest, the borrower raised usury as an affirmative defense. *Liebergesell*, 93 Wn.2d at 885-86. In considering whether the lender could estop the borrower from raising the usury defense, based on a fiduciary relationship between the parties, the *Liebergesell* court reviewed the relevant case law and listed several factors that may establish a fiduciary relationship in fact where one would not normally arise in law:

> For instance, in *Salter v. Heiser*, [36 Wn.2d 536, 550-55, 219 P.2d 574 (1950)], lack of business expertise on the part of one party and a friendship between the contracting parties were important in establishing the right to rely. *Graff v. Geisel*, 39 Wn.2d 131, 141-42, 234 P.2d 884 (1951). Superior knowledge and assumption of the role of adviser may contribute to the establishment of a fiduciary relationship. Friendship seemed a determinative element under the facts of *Gray v. Reeves*, 69 Wash. 374, 376-77, 125 P. 162, 163 (1912).

*Liebergesell*, 93 Wn.2d at 891. The *Liebergesell* court then concluded that the lender had submitted sufficient evidence to establish a fiduciary relationship and overcome summary judgment. *Liebergesell*, 93 Wn.2d at 891.

¶12 Similarly, in *Tokarz*, Division Three of our court considered whether a savings and loan association had a duty to disclose to a borrower that his builder was having financial problems and was unable to perform other contracts in which the savings and loan was the lender. *Tokarz*, 33 Wn. App. at 458. The *Tokarz* court first observed that a bank generally does not enter into a fiduciary relationship with a depositor or customer, but it acknowledged that modern banking practices involve complexities that "often thrust a bank into the role of an adviser, thereby creating a relationship of trust and confidence which may result in a fiduciary duty upon the bank to disclose facts when dealing with the customer." *Tokarz*, 33 Wn. App. at 458-59 (citing *Stewart v. Phoenix Nat'l Bank*, 49 Ariz. 34, 64 P.2d 101, 106 (1937)). But the *Tokarz* court concluded that no special circumstances established a fiduciary duty in that case because there was no evidence that the savings and loan (1) took on any extra service for the borrower, other than furnishing the money for constructing a home; (2) received any greater economic benefit from the transaction, other than the normal mortgage; (3) exercised extensive control over the borrower's construction project; or (4) was asked by the borrower if there were any lien actions pending against the builder. *Tokarz*, 33 Wn. App. at 462-63.

¶13 Finally, in *Hutson*, Division Three of this court considered whether a savings and loan association had a duty to define the phrase "mortgage insurance" for a borrower where the borrower alleged that she had asked the lender to procure credit life insurance (which pays the balance of the mortgage if the mortgagor dies), but the lender procured only mortgage insurance (which insures the lender if the borrower defaults on the mortgage). *Hutson*, 22 Wn. App. at 92, 100. The lender never explained the difference between the two and, when the borrower saw

that she was paying for mortgage insurance, she believed it was credit life insurance. *Hutson*, 22 Wn. App. at 93. Division Three recognized that a "lender is not a fiduciary in the common sense of the term" because it profits from the business transaction. *Hutson*, 22 Wn. App. at 102. But the court observed that the lender in this case had (1) advised the borrower about the availability of a federal subsidy and reviewed and submitted the application to the federal government on her behalf; (2) persuaded the borrower to obtain a home construction loan, rather than a home improvement loan, because the former would be easier to finance; and (3) offered to provide an "extra service" by arranging credit life insurance for the borrower. *Hutson*, 22 Wn. App. at 92, 94, 102-03. The *Hutson* court held:

> While the lender's duty is not that of a fiduciary, we hold that, under the circumstances of this case, it was a jury question whether the lender had a duty to define any ambiguous or specialized terms which might mislead unknowledgeable and uncounseled customers, members of the lay public who rely on the lender's advice. The relationship between such parties involves more trust and confidence than is true of ordinary arm's length dealing, even though the lender legitimately profits from the transaction.

*Hutson*, 22 Wn. App. at 105.

¶14 Applying these principles, we hold that the facts of this case are not sufficient to overcome the general rule that parties to a business transaction deal at arm's length and do not enter into a fiduciary relationship. Viewing the facts in the light most favorable to the Annechinos, we will assume that the Bank took on an "extra service" by agreeing to help the Annechinos structure their accounts to provide full FDIC coverage, and that Worthy and Reynolds never advised the Annechinos to independently verify the FDIC rules and regulations. Even so, there is no evidence that the Bank sought out the Annechinos' business, knowingly withheld relevant information from them, exercised extensive control over the transaction, or received a greater than customary economic benefit from the transaction. Nor is there any

evidence that the Annechinos were induced to rely on the Bank due to a close personal relationship or lack of business expertise. On the contrary, the Annechinos reviewed the Bank's recommendations, requested revisions, and successfully negotiated a favorable interest rate on their deposits. There is no evidence that the parties' relationship or the nature of this transaction involved more trust and confidence than a typical arm's length transaction.

¶15 Furthermore, even assuming the facts are sufficient to create a fiduciary relationship, *Tokarz* establishes that a *bank* may enter into such a relationship with a depositor:

> [M]odern banking practices ... often thrust a *bank* into the role of an adviser, thereby creating a relationship of trust and confidence which may result in a fiduciary duty upon the *bank* to disclose facts when dealing with the customer.

*Tokarz*, 33 Wn. App. at 459 (emphasis added). Similarly, *Hutson* held that a savings and loan association, through the actions of one of its employees, had established a fiduciary relationship with a borrower. *Hutson*, 22 Wn. App. at 102-03. Neither case establishes that a bank officer or employee, acting within the ordinary scope of his or her duties, can be individually liable for breaching the *bank's* fiduciary duty to a customer.

¶16 The Annechinos cite *Senn v. Northwest Underwriters, Inc.*, 74 Wn. App. 408, 875 P.2d 637 (1994), for the proposition that "[p]ersonal liability is routinely imposed when fiduciary duties are breached." Br. of Appellants at 20. In *Senn*, an insurance company was placed into receivership and the receiver sued the company's president and secretary for breach of a fiduciary duty. *Senn*, 74 Wn. App. at 410-11, 413. The president and secretary were husband and wife and owned all of the company's stock. *Senn*, 74 Wn. App. at 410-11. Division One of this court held that the secretary clearly owed a fiduciary duty to the *company*

under RCW 48.05.370,[3] and that her failure to discover the president's conversion of over $12 million in insurance premium payments was a breach of that duty. *Senn*, 74 Wn. App. at 414-17. The *Senn* court did not hold the secretary personally liable for breaching a fiduciary duty to a third party.

¶17 *Senn* is consistent with Washington case law, which generally holds that a corporate officer cannot be held personally liable unless the officer knowingly and in bad faith commits or condones a wrongful act in the course of carrying out his or her duties. *See Schwarzmann v. Ass'n of Apartment Owners of Bridgehaven*, 33 Wn. App. 397, 403, 655 P.2d 1177 (1982); *see also Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548, 554, 599 P.2d 1271 (1979); *Consulting Overseas Mgmt., Ltd. v. Shtikel*, 105 Wn. App. 80, 84-85, 18 P.3d 1144 (2001) (citing *Johnson v. Harrigan-Peach Land Dev. Co.*, 79 Wn.2d 745, 753, 489 P.2d 923 (1971)).

¶18 *Senn* is also consistent with case law from other jurisdictions holding that corporate officers generally owe a fiduciary duty to their *corporation*, but owe no such duty to third parties unless they knowingly participate in wrongful conduct. *Slottow v. Am. Cas. Co. of Reading, Pa.*, 10 F.3d 1355, 1359 (9th Cir. 1993) (" '[A] corporation's employees owe no independent fiduciary duty to a third party with whom they deal on behalf of their employer.' " (applying California law) (quoting *Grosvenor Props. Ltd. v. Southmark Corp.*, 896 F.2d 1149, 1154 (9th Cir (1990))); *Grierson v. Parker Energy Partners 1984-I*, 737 S.W.2d 375, 377 (Tex. App. 1987) ("Corporate officers owe a fiduciary duty to the shareholders and the corporation. Generally, however, they owe no duty to third persons. They may not, however, direct or participate in tortious acts. A corporate agent who

---

[3] RCW 48.05.370 provides:

Officers and directors of an insurer or a corporation holding a controlling interest in an insurer shall be deemed to stand in a fiduciary relation to the insurer, and shall discharge the duties of their respective positions in good faith, and with that diligence, care and skill which ordinary prudent persons would exercise under similar circumstances in like positions.

knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent for the corporation." (citations omitted)). Here, there is no evidence that Worthy or Reynolds knowingly participated in wrongful conduct or acted in bad faith when helping the Annechinos structure their accounts. Accordingly, they cannot be held personally liable for the Annechinos' loss.

### III. ALTERNATIVE ARGUMENTS

¶19 The Annechinos also rely on *Roth v. Kay*, 35 Wn. App. 1, 664 P.2d 1299 (1983), to argue that Worthy and Reynolds voluntarily assumed a duty to properly structure their accounts and, therefore, can be held personally liable for failing to do so. In *Roth*, a worker brought a negligence claim against a doctor for failing to file his worker's compensation application with the Department of Labor and Industries. *Roth*, 35 Wn. App. at 2. Division One of this court held that the doctor arguably had a statutory duty to file the application under RCW 51.28.020, but even if the doctor had gratuitously agreed to file the application, " 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.' " *Roth*, 35 Wn. App. at 3-4 (quoting *Glanzer v. Shepard*, 135 N.E. 275, 276 (N.Y. 1922)).

¶20 *Roth* is distinguishable. There, the doctor gratuitously agreed to perform a service outside the scope of a typical doctor-patient relationship. Here, Worthy and Reynolds were acting on behalf of the Bank, the parties were engaged in a business transaction, and the service they agreed to perform, even if characterized as an "extra service," was still within the scope of a normal banking transaction. To hold that Worthy and Reynolds voluntarily assumed a duty to the Annechinos in this context would eviscerate the general rule that parties to a business transaction generally deal at arm's length and do not assume a duty to one another or enter into a special

relationship absent the circumstances described above. *Liebergesell,* 93 Wn.2d at 889; *Tokarz,* 33 Wn. App. at 458-59; *Hutson,* 22 Wn. App. at 102-03, 105.

¶21 Finally, the Annechinos argue in passing that RCW 62A.4-103,[4] which requires banks to "exercise ordinary care," also applies to bank employees. Br. of Appellants at 22. We decline to address this argument. *State v. Thomas,* 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004) ("[T]his court will not review issues for which inadequate argument has been briefed or only passing treatment has been made.").

¶22 Accordingly, we affirm the trial court's summary judgment order dismissing the Annechinos' claims against the individual defendants in this case.

QUINN-BRINTNALL and JOHANSON, JJ., concur.

Review granted at 172 Wn.2d 1020 (2011).

[Nos. 40157-6-II; 40167-3-II;     Division Two.   June 1, 2011.]
40177-1-II; 40187-8-II.

---

[4] Chapter 62A.4 RCW codifies Article 4 of the Uniform Commercial Code, which concerns bank deposits and collections. RCW 62A.4-101. RCW 62A.4-103(a) provides:

The effect of the provisions of this Article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure.