[No. 31783-1-I.    Division One.    May 31, 1994.]

DEBORAH SENN, *as Insurance Commissioner, Respondent*, v. NORTHWEST UNDERWRITERS, INC., ET AL, *Defendants*, MARY ANN CIMOCH, ET AL, *Appellant*.

---

*William B. Foster III*, for appellants.

*Victoria L. Vreeland* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim; Henry E. Lippek* and *Krutch, Lindell, Housh, Bingham & Keller, Inc., P.S.,* for respondent.

AGID, J. — Mary Ann Cimoch appeals an order of summary judgment holding her personally liable for defalcation of over $12 million from an insurance company of which she was an officer and a director. We hold that she breached her statutory fiduciary duty as a director of Consumers Indemnity Company, that her ignorance of another director's conversion of funds does not excuse her failure to act and that her inaction was a proximate cause of the company's losses. We therefore affirm.

## I

### FACTS

Consumers Indemnity Company (Consumers), through its exclusive agent and administrator, Northwest Underwriters, Inc. (Underwriters), offered reimbursement insurance to car dealers for the cost of repairs to automobiles covered under extended warranty contracts. All of Consumers' and Underwriters' stock was held by Cimoch, Inc., which in turn was owned by the Defendants below, Norman and Mary Ann

Cimoch.[1] Norman Cimoch was president and chairman of the board of both Consumers and Underwriters. Mary Ann Cimoch was the secretary and a director of all of the affiliated companies. Norman and Mary Ann Cimoch were also licensed agents for both Consumers and Underwriters.

Consumers offered its clients several insurance policies to cover different programs. The policy relevant to this action is the Insured Service Contract (ISC), a policy offering insurance protection to the policyholders in the event they were required to repair a covered automobile. For each car warranty issued to a car purchaser under the ISC program, the dealer remitted a specified sum[2] to Underwriters to cover insurance against the dealer's risk of loss. More than 90 percent of the ISC policy business was written to automobile dealers who submitted payments based on the total number of contracts and type of cars for which the dealers had offered contractual warranty protection. As the insurance agent, Underwriters collected all payments from the dealers on behalf of Consumers. Under the terms of a managing agency contract between Consumers and Underwriters, Underwriters was to receive a commission of 2 percent of each premium and, as Consumers' administrator, $60 per claim paid and administrated by Underwriters.[3]

On October 31, 1988, Consumers was placed into receivership based upon a finding that it was insolvent by more than $5 million. Joseph Sterne, the court appointed receiver, began an investigation to determine Consumers' total liabil-

---

[1]Mary Ann Cimoch states that she owned no interest in Cimoch, Inc., Underwriters or Consumers and that these companies were solely owned by Norman Cimoch. Mary Ann and Norman Cimoch, however, were married at all times relevant to this case, and she has not offered any evidence to rebut the presumption that the property was community property. *See In re Marriage of Olivares*, 69 Wn. App. 324, 331, 848 P.2d 1281 (property acquired during marriage is presumed to be community property; presumption may be rebutted by clear and convincing evidence), *review denied*, 122 Wn.2d 1009 (1993).

[2]The payments ranged from $120 to $350 per contract, depending on the vehicle and the duration and type of coverage.

[3]This contract was never filed nor approved by the Insurance Commissioner (Commissioner) as required former by RCW 48.07.090.

ity for unearned premiums. Based on Consumers' comput-erized records, he issued a report listing all contracts in force for each policyholder and detailing basic contract in-formation, including the total insurance payments by the policyholders. In December 1988, Sterne mailed reports to all policyholders covered by ISC and other Consumers poli-cies. Soon after, he received numerous calls from dealers contending that his calculation of premiums booked to Consumers and, thus, unearned premiums owed to them, was grossly understated.

Based on these complaints, Sterne investigated the cause of the discrepancy and found that in June 1987, Norman Ci-moch had begun placing money from premium payments into a program called the Northwest Dealer Reserve Pro-gram (Reserve Program). Until April 1987, Underwriters had forwarded the payments directly to Consumers which then compensated Underwriters by paying commissions and/or administrative fees pursuant to the terms of the managing agency contract. Also until April 1987, the amount remitted by dealers was placed on Consumers' books as premiums, accounted for as such, and the premium tax was paid upon the amount remitted. Beginning in June 1987, Underwriters, pursuant to its recently implemented Reserve Program, began forwarding only $20 of each dealer payment for new car coverage to Consumers and retaining the balance.[4] A small portion of the difference between the payment received and the $20 credited to Consumers was entered into Underwriters' records as a trust account.[5] The remainder was entered as Underwriters' income from

---

[4]In his investigation, the Commissioner discovered that the Reserve Program codes appeared only on contracts covering new cars, although virtually all of the dealers involved had coverage for both new and used cars. This is significant because little is paid out on new cars during the first few years when defects are remedied under the car manufacturer's warranty. Thus, reserve shortfalls are not immedi-ately apparent because claims are made long after premiums are paid.

[5]The Commissioner's investigation uncovered no trust agreement at Underwrit-ers for the Reserve Program funds and revealed that the funds labeled "trust ac-count" had been routinely commingled with other funds held by Underwriters.

administrative fees. Under the Reserve Program, millions of dollars of payments collected under Consumers' ISC policies were retained by Underwriters.[6] Sterne also determined that Consumers owed its policyholders an additional $8.1 million based on other payments he determined should have been booked to Consumers. These amounts matched the amounts the dealers proved in their claims submitted under the ISC program.

Based on Consumers' and Underwriters' records, Sterne determined the Cimochs personally benefited from a large percentage of the moneys that were retained by Underwriters. Sterne calculated that between June 1, 1987, and October 31, 1988, Norman Cimoch paid himself, his wholly owned business entities, and his family over $3.5 million from the general accounts of Underwriters. Included among these amounts are more than $2 million in stockholder dividends the Cimochs received during that period.

Sterne petitioned for and secured a restraining order and an order to show cause against Underwriters demanding that all moneys being held by Underwriters under the Reserve Program be paid immediately to the receiver. On February 9, 1989, he secured an order directing that all premium moneys collected by Underwriters be transferred to the receivership. The receivership eventually recaptured approximately $1.8 million. On March 16, 1989, the Commissioner, as receiver for Consumers, sued Underwriters, Cimoch, Inc., and Norman and Mary Ann Cimoch alleging breach of fiduciary duty, conversion, breach of contract and violation of the Consumer Protection Act. On July 23, 1992, the Commissioner moved for summary judgment, seeking judgment for $12.3 million against all Defendants jointly and severally. The trial court granted partial summary judgment against the Defendants on the breach of fiduciary duty claim. Mary Ann Cimoch appealed this order.

---

[6]Sterne determined that the total amount of payments retained by Underwriters from June 1987 through October 31, 1988, the date the Commissioner took over the company, was over $12 million.

## II
### CIMOCHS LIABILITY FOR UNDERWRITERS DEFALCATION

■ In order to establish liability for breach of fiduciary duty, the Commissioner bears the burden of showing (1) that Cimoch breached her fiduciary duty to the corporation and (2) that the breach was a proximate cause of the losses sustained. *See Interlake Porsche + Audi, Inc. v. Bucholz,* 45 Wn. App. 502, 509, 728 P.2d 597 (1986) (establishing elements for breach of fiduciary duty in a shareholder derivative action), *review denied,* 107 Wn.2d 1022 (1987).

Cimoch clearly owed a fiduciary duty to Consumers in her capacity as one of its officers and directors[7] under RCW 48.05.370. That statute provides:

> Officers and directors of an insurer or a corporation holding a controlling interest in an insurer shall be deemed to stand in a fiduciary relation to the insurer, and shall discharge the duties of their respective positions in good faith, and with that diligence, care and skill which ordinary prudent men would exercise under similar circumstances in like positions.

Thus, the remaining issues are whether Cimoch breached her statutory fiduciary duty to Consumers and, if so, whether she is liable for its losses. Cimoch contends that a genuine issue of material fact exists concerning her liability for Underwriters' defalcation because she was unaware of it and did not participate in the formation or implementation of the Reserve Program. The Commissioner maintains that Cimoch is liable notwithstanding her lack of knowledge of the diversion.

■■ We hold that officers and directors have an affirmative duty to be aware of the affairs of the companies they serve and that they can be held liable for activities of other officers and directors which they reasonably should know about. No Washington case addresses this issue directly under either the insurance code or similar provisions of

---

[7]Because we conclude that Cimoch breached her duty as a director of Consumers, we do not reach the Commissioner's arguments concerning her duties as agent or as an officer and director of Underwriters. The parties also argue other bases of liability including spousal tort liability, corporate disregard liability and Cimoch's falsification of an annual statement. We discuss only breach of fiduciary duty because this was the basis for the trial court's order and we affirm on this basis.

former RCW 23A.08 and 23B.08, the former and current business corporations acts.[8] However, we find the Supreme Court of New Jersey's reasoning on this issue in *Francis v. United Jersey Bank*, 87 N.J. 15, 432 A.2d 814 (1981) persuasive and adopt it here. The facts in *Francis* were very similar to those presented here,[9] and involved a statutory provision that is virtually identical to RCW 48.05.370.[10] In *Francis* the court held that, in order to discharge her statutory fiduciary duty, "[a]s a general rule, a director should acquire at least a rudimentary understanding of the business of the corporation", and that a director is "under a continuing obligation to keep informed about the activities of the corporation." 87 N.J. at 31. The *Francis* court held the director liable for a defalcation by other officers of the company because her inattention to the company's business contributed to the company's loss. The court reasoned that

---

[8]Cimoch cites *Northern Codfish Co. v. Stiberg*, 96 Wash. 126, 164 P. 750 (1917) and *Messenger v. Frye*, 176 Wash. 291, 28 P.2d 1023 (1934), for the proposition that "Washington courts have long held that a person will not be individually liable for the wrongful acts of a corporation merely because they occupy the position of an officer and/or director of the corporation." These cases, however, do not support her argument. In *Northern Codfish*, the court held there was insufficient evidence of negligence where trustees had not participated in the fraud and where the plaintiff had "not even alleged that they knew of the fraud, *and it is not shown that they could have discovered the fraud by diligence.*" (Italics ours.) 96 Wash. at 132. In this case the Commissioner established that Cimoch would have discovered the defalcation had she exercised due diligence. *Messenger* is not on point because it involves liability to third persons for tortious acts of other directors, not a director's liability to the corporation for breach of his or her fiduciary duty.

[9]Pritchard & Baird was a reinsurance brokerage operated as a closely held family corporation which commingled all its funds in one account. Mrs. Pritchard was a director of the corporation. Over a period of 5 years, two of the other directors (Mrs. Pritchard's sons) took out "loans" from the corporation which, at the end of that period, "had metastasized to a total of $12,333,514.47." 87 N.J. at 24. When the corporation was forced into bankruptcy, the trustee discovered the conversions and sought repayment on behalf of the creditors. The issue was whether Mrs. Pritchard was liable as a director even though she "knew virtually nothing of [the corporation's] affairs." 87 N.J. at 26.

[10]The statute construed in *Francis*, former N.J. Stat. Ann. § 14A:6-14 (West Supp. 1994), places a duty upon directors to "discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." 87 N.J. at 28.

[b]ecause directors are bound to exercise ordinary care, they cannot set up as a defense lack of the knowledge needed to exercise the requisite degree of care. If one "feels that he has not had sufficient business experience to qualify him to perform the duties of a director, he should either acquire the knowledge by inquiry, or refuse to act."

87 N.J. at 31 (quoting *Campbell v. Watson*, 62 N.J. Eq. 396, 416, 50 A. 120 (1901)). The logic of this proposition is irrefutable. One cannot discharge a duty by remaining ignorant of what that duty entails. Just as ignorance of the law is no excuse for the violation of a law, ignorance of the affairs of a business to which one owes a duty of diligence, care and skill does not excuse a director from liability for his or her colleagues' fraud or malfeasance.

Other jurisdictions have imposed a duty similar to that articulated in *Francis* on directors and officers either under common law principles or statutory provisions. *See Doyle v. Union Ins. Co.*, 202 Neb. 599, 608, 277 N.W.2d 36, 41 (1979) ("Directors should have a general knowledge of the manner in which the corporate business is conducted; and, where the duty of knowing exists, ignorance because of neglect of duty on the part of a director creates the same liability as actual knowledge and failure to act on that knowledge."); *Mobridge Comm'ty Indus., Inc. v. Toure, Ltd.*, 273 N.W.2d 128, 133-34 (S.D. 1978) ("each director is charged with monitoring the heartbeat of the business and knowing where the corporation stands in regard to finances, obligations, goals, policies, etc. Where such a duty exists, ignorance due to neglect of that duty 'creates the same liability as actual knowledge and a failure to act thereon.' " (Citation omitted.)); *Platt Corp. v. Platt*, 42 Misc. 2d 640, 643, 249 N.Y.S.2d 1, 6 (1964) ("It is the obvious duty of directors to know what is transpiring in the business affairs of their corporation. They cannot assume the responsibilities of their fiduciary position, then simply close their eyes to what is going on around them and thereby avoid the consequences by the mere failure to act. While corporate directors are not liable for errors of judgment, nevertheless, the law holds them accountable for that which they reasonably should have known or discovered in

the discharge of their duties. Mere passivity and disavowal of knowledge alone do not and should not constitute a pass to freedom from responsibility." (Citations omitted.)), *order aff'd*, 23 A.D.2d 822 (1965), *rev'd on other grounds*, 17 N.Y.2d 234, 270 N.Y.S.2d 408 (1966); *Olin Mathieson Chem. Corp. v. Planters Corp.*, 236 S.C. 318, 328, 114 S.E.2d 321, 326 (1960) ("An officer of a corporation will not be shielded from liability because of a want of knowledge of wrongdoing of another officer if that ignorance is the result of such officer's negligence and inattention to the business.") In our view, RCW 48.05.370 demands no less. We hold that Cimoch's failure to be involved in and familiarize herself with the business of Consumers, rather than insulating her from liability, establishes a breach of her statutory fiduciary duty as a director of Consumers under the statute.

■■ The final issue is whether Cimoch's breach was, as a matter of law, a proximate cause of Consumers' loss.

> Proximate causation consists of two elements: cause in fact and legal causation. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). Cause in fact concerns the "but for" consequences of an act: those events the act produced in a direct, unbroken sequence, and which would not have resulted had the act not occurred. *Hartley*, at 778. Legal causation rests on considerations of policy and common sense as to how far the defendant's responsibility for the consequences of its actions should extend. *Hartley*, at 779. The question of legal causation is so intertwined with the question of duty that the former can be answered by addressing the latter. *Hartley*, at 779-80 (quoting W. Prosser, *Torts* 244-45 (4th ed. 1971)).

*Taggart v. State*, 118 Wn.2d 195, 225-26, 822 P.2d 243 (1992). We have already determined that Cimoch owed a statutory fiduciary duty to Consumers. We further hold that those same reasons of logic and public policy require that she be held liable for any damages flowing from a breach of that duty which is a cause in fact of the damage.

■ In determining the proper standard to apply to a case involving nonfeasance, we again turn to *Francis v. United Jersey Bank, supra*, for guidance. There, the court examined the scope of the duties of a director and held that, under the circumstances of that case, it extended beyond the duty to

object, vote for the correct action and/or resign, actions which will normally absolve a director from liability. 87 N.J. at 40. Because the conversions were "so blatantly wrongful" that the other directors would have had to stop if confronted and because the business owed a duty to third parties, the insureds, the court held that Mrs. Pritchard's duties as a director "encompassed all reasonable action to stop the continuing conversion." 87 N.J. at 41. The same factors are present here. The fraud was similarly blatant, and Consumers' directors, like those of Pritchard & Baird in the *Francis* case, owed a duty not only to the company but also to those it purported to insure. Thus, we conclude that Cimoch was required to take reasonable steps to stop the continuing course of conduct. She took none.[11]

We next address the question of cause in fact. Cimoch's liability is limited to the loss that was the "but for" consequence of her failure to act. The question, as phrased by Judge Learned Hand in *Barnes v. Andrews*, 298 F. 614 (S.D.N.Y. 1924), is whether "the performance of the defendant's duties would have avoided loss, and what loss it would have avoided." 298 F. at 616. Where, as here, "the corporate funds have been illegally lent, it is a fair inference that a protest would have stopped the loan, and that the director's neglect caused the loss." 298 F. at 616. Given the size of the diversion and Cimoch's substantial nonfeasance, the trial court properly inferred causation as a matter of law. Had Cimoch been even minimally involved in Consumers' affairs, she would have been on inquiry notice that funds

---

[11]We do not undertake to establish the extent and scope of an officer's or director's duty to prevent defalcations of other officers or directors. Because Cimoch failed entirely to take any action, that issue is not presented by this case. However, as the court in *Francis* noted, an individual in her position could be expected to do a number of things to prevent losses to the company to which she owes a duty. At a minimum, a director has a duty to make an objection to the other officers. He or she may also be required to resign in protest against those actions. In some instances, he or she may be required to consult with an attorney and even sue or threaten to sue the other directors in order to halt their activity. *See* 87 N.J. at 44-45. As the court noted in *Francis*, the determination of the extent of a director's duty to act is best left to a case-by-case determination. 87 N.J. at 45.

were being diverted. Had she reviewed Consumers' records, she would have immediately discovered the diversion of ISC policy money because, instead of receiving approximately $300 for each warranty contract, Consumers was receiving only $20 per contract. This represents a 95 percent diversion of this portion of Consumers' insurance business and a 40 percent diversion of total ISC premiums. She also would have discovered that between June 1987 and September 1988, $30.3 million was paid by dealers for ISC insurance coverage, but Consumers only received $18 million.

██ Summary judgment is appropriate where no genuine issue of material fact exists and where the moving party is entitled to judgment as a matter of law. CR 56(c). In evaluating a motion for summary judgment, all reasonable inferences are to be construed against the moving party, *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990), and the motion should only be granted if, from all the evidence, reasonable persons could only reach one conclusion. *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974). Even viewing the evidence in the light most favorable to Cimoch, the diversion was so large that, had she discharged her duties as an officer and director, she would have noticed it and been in a position to take all reasonable actions to stop it.[12] Her failure to do so was a proximate cause of Consumers' loss, and summary judgment was properly granted.[13]

---

[12]Because we hold that causation will be inferred as a matter of law where a fiduciary has a duty to inquire and act but fails to do so, there is no factual issue for a jury to resolve. The question of the extent of her liability would be a factual issue had she discovered the defalcation and taken some action. Only then would there be a question as to whether her action was appropriate and, if not, how much of the loss she could have prevented.

[13]Cimoch further argues she is shielded from liability by the business judgment rule. *See* RCW 23B.08.300. She argues that even if a mistake was made in implementing the Reserve Program, the inference should be that it was made in good faith because of the similarity between it and another Consumers program. Again, Cimoch is confusing the issue of her personal liability for her breach of her own fiduciary duty with liability for the actions of Norman Cimoch. As discussed above, the pertinent issue in this case is Cimoch's liability for her own actions. Furthermore, as the Commissioner points out, the business judgment

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

We affirm.

WEBSTER, C.J., and KENNEDY, J., concur.

rule applies where a loss results from a decision or action by an officer or director, not "where the loss is the result of failure to exercise proper care, skill and diligence." 3A William M. Fletcher, *Private Corporations* § 1040, at 56 (perm. ed. 1986).