**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| JERRY KESSLERING, individually and<br>as a shareholder on behalf of<br>KESSELRING GUN SHOP, INC., in<br>a derivative action, | )<br>)<br>)<br>)<br>) | No. 78764-1-I<br><br>DIVISION ONE |
| Appellant, | )<br>) | |
| v. | )<br>) | |
| DONALD KESSELRING, and JUDITH<br>G. KESSELRING, husband and wife<br>and the marital community comprised<br>thereof, KEITH KESSELRING and<br>MARY KESSELRING, husband and<br>wife and the marital community<br>comprised thereof, ESTATE OF BRAD<br>D. KESSELRING and KESSELRING<br>GUN SHOP, INC., a Washington<br>corporation, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br><br><br><br>UNPUBLISHED OPINION |
| Respondents. | )<br>) | |

MANN, C.J. — Jerry Kesselring appeals the judgment entered following a bench

trial. Jerry[1] was a minority shareholder of Kesselring Gun Shop, Inc. (KGS). Jerry sued

his brothers, Keith Kesselring and Donald Kesselring, who were directors and officers of

KGS, for breach of fiduciary duties, contending that his brothers mismanaged KGS.

_____

[1] This opinion uses first names for the Kesselring family in order to avoid confusion. No
disrespect is intended.

Citations and pincites are based on the Westlaw online version of the cited material.

According to Jerry, the mismanagement caused KGS to lose its Alcohol Tobacco & Firearms (ATF) license, resulted in incorrect inventory records and tax liability to KGS for understating inventory, and allowed family members to embezzle and use corporate assets for personal purposes. Once the ATF revoked KGS's license, the company was liquidated and lost over $5 million in value.

Jerry contends that the trial court erred in applying the business judgment rule to immunize Donald's and Keith's mismanagement, that the evidence does not support the court's findings of fact and conclusions of law, and Donald and Keith should be liable to KGS with Jerry receiving a greater distribution than Donald and Keith. We affirm.

I.

In 1947, the parties' grandfather, Clarence Kesselring, opened KGS in Skagit County.[2] Clarence's son, Ronald, and his wife Frances took over the business in 1980. Although KGS was incorporated in 1971, the "sole proprietorship mentality" continued. Over time, Ronald and Frances transferred their shares of KGS to their four sons, Donald, Keith, Brad, and Jerry. In 2009, Donald owned 43 percent of the shares, and Keith, Brad, and Jerry each owned 19 percent.

Until her death in 2003, Frances was in charge of the administrative aspects of the business, including the business paperwork, bookkeeping, accounts receivable and payable, and payroll. After Frances died, Brad took over her duties, including the responsibility for financial matters and operations. Ronald continued to run KGS; Donald worked in retail sales and as a gunsmith, and Keith was involved in off-site sales to law enforcement agencies.

---

[2] The recitation of the facts is largely based on the trial court's unchallenged findings of fact.

After 2008 or 2009, Ronald "stepped away for the most part from the day-to-day management." Ronald remained president of KGS, however, and still made major decisions until 2009. Keith, Donald, and Brad assumed full day-to-day management duties in 2008-2009. Each had his own area of expertise and they divided up responsibilities that way. With the brothers having divided up their areas of responsibility, the existing business practices continued because the brothers were not necessarily communicating with each other about what was happening in each other's area of the business.

From 2008 on, Donald and Keith were named directors and officers of KGS. Brad was a director and officer of KGS in 2008 and 2009. Jerry never served as an officer but was a director for one month from September 13, 2010 to October 15, 2010. Jerry was also elected to serve as a director for January 31, 2012 to January 24, 2013 but declined.

Jerry worked as a project manager for MOD Pizza and did not participate in the day-to-day management or governance of KGS. Periodically, Jerry would work on weekends or holidays at KGS. Jerry's wife, Beverly, worked in the shop on weekends and during the summer when on break from her job as a public school teacher.

KGS was a very profitable business. KGS's business operations and management structure did not change when KGS incorporated. Jerry attempted to upgrade business practices at KGS but many of his suggestions were not implemented by Donald, Keith, and Brad.

A 2005 ATF audit revealed numerous violations of federal regulations applicable to KGS. Most significantly, the audit revealed hundreds of firearms that were not

recorded in the acquisition and disposition logs, and no record of whether the guns were sold or destroyed. Additionally, there was inaccurate recording of firearm sales on ATF Form 4473s which must be filled out by each gun purchaser. The ATF issued a report of violations on March 20, 2006. In June 2010, the ATF notified KGS that it was required to attend a meeting to develop a compliance plan concerning the March 2006 report of violations. This was the first notice KGS received relating to the 2006 report of violations.

In late 2009, the brothers discovered that Brad had been taking substantial sums of money from KGS for his own purposes. The embezzlement came to light when Donald became aware of financial difficulties, and Jerry was examining the bank statements and corporate records and discovered financial discrepancies. The brothers confronted Brad and he returned $130,000. Shortly thereafter, Brad committed suicide. After Brad's death, the family discovered that Brad had an infant child who would inherit Brad's shares in KGS. Keith and Jerry discovered that Brad's embezzlement was extensive and he stole approximately $850,000 from KGS.

Keith became the personal representative of Brad's estate. KGS filed a creditor claim for $850,000 against Brad's estate. Brad's estate, KGS, attorneys representing Brad's child, Keith, and Donald negotiated a settlement. Under the settlement, Brad's estate paid $420,000 in satisfaction of Brad's embezzlement and KGS paid Brad's estate $450,000 for Brad's outstanding shares in KGS. The KGS board approved the settlement and when the shareholders voted, Jerry voted against the action, Donald voted for it, and Keith abstained. Brad's shares were distributed to Donald, Keith, and Jerry so that Donald owned 53.4 percent and Keith and Jerry each owned 23.3 percent.

While investigating Brad's embezzlement, Jerry learned the amount of Donald and Keith's salaries and bonuses and believed them excessive. Jerry also documented credit card charges by his father and brothers for personal expenses from KGS funds. Jerry also discovered that Donald had taken interest free loans from KGS. Jerry felt that this was a mismanagement of KGS's assets. Jerry's investigation also uncovered that KGS had under-reported its firearms inventory and its taxable income to the Internal Revenue Service (IRS).

After discovering Brad's embezzlement, KGS hired a non-family chief financial officer, Mel Call. Call calculated KGS's inventory at approximately $8 million dollars, which was approximately $5 million dollars more than had been reported in the preceding years to the IRS. The restatement of inventory value created additional tax liability for each shareholder. KGS gave Donald and Keith bonuses to help pay their additional federal income taxes resulting from the restatement of inventory valuation. Jerry did not pay the added assessed tax liability but spent 562.2 hours of his own time resolving the issue with the IRS. Jerry also paid $500 for tax advice.

In 2010, Keith met with ATF representatives to develop and implement the KGS Compliance Plan. ATF approved the plan and Keith supplemented the employee handbook with specific instructions about correctly completing the acquisition and disposition log and ATF Form 4473. As part of the KGS Compliance Plan, KGS was required to file quarterly reports with the ATF on KGS's progress.

Because of the inventory valuation restatement, Brad's embezzlement, and Jerry's concerns about Donald and Keith's management of KGS, Jerry informed his

brothers that he wanted to sell his interest in KGS. Negotiations ensued for several months but were unsuccessful.

In March 2010, Keith was hospitalized for brain tumor surgery. In June 2010, Jerry filed this action in Skagit County Superior Court. Jerry requested appointment of a receiver, dissolution of KGS, liquidation of the assets of KGS, and distribution to the shareholders.

On March 22, 2011, ATF began another inspection of KGS. On August 25, 2011, ATF notified KGS of inspection violations related to unaccounted firearms and gun sales reporting violations. The inspection also determined that ATF Form 4473 was still being filled out incompletely, inaccurately, or not at all. Keith implemented further measures to meet compliance requirements.

On October 9, 2012, KGS received a Notice of Revocation from ATF of KGS's license to sell firearms based on the 2011 inspection. In early 2013, Donald and Keith, on advice of counsel, decided not to appeal ATF's decision. On October 11, 2013, Jerry filed a motion for summary judgment requesting that the trial court appoint a receiver to liquidate the assets and distribute the proceeds to the shareholders. Shortly thereafter, the Board of Directors of KGS met and voted to dissolve the corporation. The trial court entered an agreed order for receivership and began the process of winding up KGS.

In 2013, KGS made distributions to Donald, Jerry, and Keith, in proportion to their ownership interest. Donald received, $1,362,352.94, and Jerry and Keith each received $593,823.53 in distributions. The receiver liquidated KGS's inventory and it was sold at a discount. After paying receiver fees, receiver's attorney fees, auction costs, and

creditors, the receiver deposited $810,326.89 in the court registry. Other assets included the $15,000 in an attorney trust account.

Douglas McDaniel testified as Jerry's expert in business valuation. McDaniel is a certified public accountant (CPA), certified business analyst (CBA), certified fraud examiner, and certified financial forensics (CFF). McDaniel valued KGS as of December 31, 2009 at $8.44 million using the asset approach. McDaniel compared that value to the liquidation value of $810,000 in the court registry.

After the 11-day bench trial, the trial court entered findings of fact and conclusions of law.[3] The court concluded that Jerry failed to prove his case by a preponderance of the evidence. The court entered the following conclusions of law

> 2.4    The burden of proof for all of Jerry Kesselring's claims and allegations is on Jerry Kesselring, because he is the Plaintiff. It is also Jerry Kesselring's burden to prove that he suffered damages as a result of the claimed actions of Keith Kesselring and Donald Kesselring, and that they were the proximate cause of those damages

> . . . .

> 2.7    Jerry Kesselring has failed to meet his burden of proof to prove by a preponderance of the evidence the remaining factual allegations and claims set forth in his Amended Complaint and/or tried by the Court in this action.

> . . . .

> 2.9    Donald Kesselring and Keith Kesselring as directors and officers of the Corporation are not personally liable for the losses to KGS because as the directors and/or officers they did not knowingly or in bad faith commit or condone a wrongful act in the course of carrying out their duties.

> 2.10   Donald Kesselring and Keith Kesselring as corporate directors and officers are not personally liable for the decisions made in the course of

---

[3] The findings of fact that Jerry challenges will be addressed in the section on substantial evidence.

management of the business as the decisions were made in good faith and without a corrupt motive.

2.11 Donald Kesselring and Keith Kesselring as corporate directors and officers are not liable for mistakes or errors of judgment made in the course of their duties as directors and officers as there is a reasonable basis to indicate that the decision and/or transaction was made in good faith.

2.12 It would be inequitable for the Court to hold Keith Kesselring and Donald Kesselring responsible for management practices and problems that were created by the family run business prior to their assuming a position of control, and that they were unable to correct despite their efforts.

The experts at trial did not provide an opinion on the amount of loss to any individual shareholder, but the trial court found that the loss in the corporation's value could be determined by measuring the difference in value of KGS as of December 31, 2009, $8,440,000, and the total of the 2013 distributions, $2,550,000.12, plus the net value in the court registry after the receivership, $810,000, totaling a loss of $5,079,000. Despite this loss, the trial court concluded that it would be inequitable to hold Donald and Keith "personally liable to KGS for the decisions they made and actions they took in an effort to comply with ATF regulations." Jerry appeals.

II.

A.

"Under exceptional circumstances, one or more of its corporate stockholders may sue to enforce the corporate right by way of a derivative suit. Such a suit is one in equity to enforce a corporate right which the corporation fails, is unable, or refuses to assert by court action." LaHue v. Keystone Inv. Co., 6 Wn. App. 765, 777, 496 P.2d

343 (1972). A derivative suit to enforce a corporate cause of action is not for the individual benefit of the stockholder. LaHue, 6 Wn. App. at 780.

The cause of action and resulting judgment belong to the corporation. LaHue, 6 Wn. App. at 780. If awarding recovery to the corporation would result in a stockholder receiving a portion of the award that he was not entitled to, the court may permit direct recovery under exceptional circumstances. Interlake Porsche & Audi, Inc. v. Bucholz, 45 Wn. App. 502, 519, 728 P.2d 597 (1986). In such an instance, "the court may look beyond the corporation and award the recovery to the individual stockholders entitled thereto." Interlake, 45 Wn. App. at 520.

An equitable remedy is an extraordinary, not ordinary, form of relief. Sorenson v. Pyeatt, 158 Wn.2d 523, 530, 146 P.3d 1172 (2006). We review the authority of a trial court to fashion equitable remedies under an abuse of discretion standard. Sorenson, 158 Wn.2d at 530. A trial court abuses its discretion if its decision is manifestly unreasonable, based upon untenable grounds, or adopts a view that no reasonable person would take. Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010). "A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts." Salas, 168 Wn.2d at 669. "A court will grant equitable relief only when there is a showing that a party is entitled to a remedy and the remedy at law is inadequate." Sorenson, 158 Wn.2d at 530.

In an appeal from a bench trial, "[w]here the trial court has weighed the evidence our review is limited to determining whether the findings are supported by substantial evidence and, if so, whether the findings in turn support the trial court's conclusion of

law and judgment." Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978).

Whether an officer or director owes a duty of care to the corporation is a question of law. Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 857, 292 P.3d 779 (2013). The issue of whether directors or officers exercised ordinary care is a question of fact. Seafirst Corp. v. Jenkins, 644 F. Supp. 1152, 1159, (W.D. Wash. 1986).

Jerry challenges 29 of the 92 findings of fact and 12 of the 22 conclusions of law. Unchallenged findings are verities. Davis v. Dep't of Labor & Indus., 94 Wn.2d 119, 123, 615 P.2d 1279 (1980). "The burden is on the challenging party to demonstrate that there is not substantial evidence in support of a challenged finding." Christianson v. Snohomish Health Dist., 82 Wn. App. 284, 287, 917 P.2d 1093 (1996). Further, we do not review the trial court's credibility determinations. Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). The trial court gave more weight to the testimony of witnesses who were at KGS on a daily basis and because those employees did not have a stake in the outcome. The court also noted great animosity between the brothers and that recollection of the parties varied; those considerations were also relevant to the trial court's credibility determinations.

B.

Jerry contends that the trial court incorrectly determined that fiduciaries in a family-held corporation owed a lower standard of care than set out in RCW 23B.08.300.[4] We disagree.

---

[4] Jerry also contends that the trial court improperly applied the business judgment rule to immunize Donald and Keith's actions. The trial court, however, based its decision on RCW 23B.08.300 and did not apply the business judgment rule. Accordingly, our review does not address whether the trial court erred in applying the business judgment rule.

In order to establish liability for breach of fiduciary duty, the plaintiff bears the burden of showing that the defendants breached their fiduciary duty to the corporation or minority shareholders and that the breach was a proximate cause of the losses sustained. Senn v. N.W. Underwriters, Inc., 74 Wn. App. 408, 414, 875 P.2d 637 (1994).

RCW 23B.08.300 provides the general standard for directors of Washington corporations:

> (1) A director shall discharge the duties of a director including duties as member of a committee:
>
> (a) In good faith;
>
> (b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
>
> (c) In a manner the director reasonably believes to be in the best interests of the corporation.

RCW 23B.08.420 provides the same standard of care for officers.

"Statutory interpretation is a question of law reviewed de novo." Jametsky v. Olsen, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). The goal of statutory interpretation is to ascertain and carry out the legislature's intent. Jametsky, 179 Wn.2d at 762. If possible, the court gives effect to the plain meaning of the statute as an expression of legislative intent. Jametsky, 179 Wn.2d at 762. A statute's language is ambiguous when we find "that it is subject to more than one reasonable interpretation." Jametsky, 179 Wn.2d at 762. When an ambiguity is present, the court "may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." Jametsky, 179 Wn.2d at 762.

The language requiring directors to exercise "the care an ordinarily prudent person <u>in a like position</u>" implies that the standard varies depending on several factors. A review of the case law does not shed light on what factors the trial court should consider when determining the standard of care for a "person in a like position." We conclude that this language is ambiguous and turn to the legislative history. From the legislative history, we discern that the legislature intended that the standard of care owed by a fiduciary to a corporation and its shareholders be relative to the business's characteristics.

> The phrase "in a like position" recognizes that the "care" under consideration is that which would be used by the "ordinarily prudent person" if such person were a director of the particular corporation.
>
> . . . The combined phrase "in a like position . . . under similar circumstances" is intended to recognize that (a) the nature and extent of responsibilities will vary, depending upon such factors as the size, complexity, urgency, and location of activities carried on by the particular corporation, (b) decisions must be made on the basis of the information known to the directors without the benefit of hindsight, and (c) the special background, qualifications, and management responsibilities of a particular director may be relevant in evaluating the director's compliance with the standard of care. Even though the quoted phrase takes into account the special background, qualifications and management responsibilities of a particular director, it does not excuse a director lacking business experience or particular expertise from exercising the common sense, practical wisdom, and informed judgment of an "ordinarily prudent person."

2 SENATE JOURNAL, 51st Leg., Reg. Sess., at 3042-43 (Wash. 1989) (second alteration in original). Thus, the standard of care required of directors is relative to the particular company and depends on the "size, complexity, urgency, and locations of activities carried on by the particular corporation."

Here, the trial court concluded:

2.8    Donald Kesselring and Keith Kesselring as directors and officers of the Corporation had the legal right to establish salaries and bonuses and other compensation for officers and directors.

2.9    Donald Kesselring and Keith Kesselring as directors and officers of the Corporation are not personally liable for the losses to KGS because as the directors and/or officers they did not knowingly or in bad faith commit or condone a wrongful act in the course of carrying out their duties.

2.10    Donald Kesselring and Keith Kesselring as corporate directors and officers are not personally liable for the decisions made in the course of management of the business as the decisions were made in good faith and without a corrupt motive.

2.11    Donald Kesselring and Keith Kesselring as corporate directors and officers are not liable for mistakes or errors of judgment made in the course of their duties as directors and officers as there is a reasonable basis to indicate that the decision and/or transaction was made in good faith.

2.12    It would be inequitable for the Court to hold Keith Kesselring and Donald Kesselring responsible for management practices and problems that were created by the family run business prior to their assuming a position of control, and that they were unable to correct despite their efforts.

In determining the standard of care under RCW 23B.08.300 and RCW 23B.08.400, the trial court could consider the characteristics of KGS. The court's conclusions of law are consistent with the language of RCW 23B.08.300 and RCW 23B.08.400. The trial court concluded that Donald and Keith acted in good faith when making business decisions. The trial court did not err in its application of the law.

C.

Next, we turn to whether substantial evidence supports the trial court's findings of fact. Jerry contends that Donald and Keith breached their duties to KGS and Jerry by losing the ATF license, failing to discover Brad's embezzlement, underreporting KGS's inventory to the IRS, using corporate assets for personal purposes, and that these

breaches proximately caused the loss in value to KGS from 2009 until 2013, valued at $5 million.

"Findings of fact will not be disturbed on appeal if supported by substantial evidence." Agronic Corp. of America v. deBough, 21 Wn. App. 459, 463, 585 P.2d 821 (1978). "An appellate court may not substitute its findings for those of the trial court, even if the reviewing court would have resolved a factual dispute the other way unless the findings of the trial court are clearly unsupported by the record." Agronic, 21 Wn. App. at 463. On appeal, Jerry challenges 29 findings of fact, but fails to provide substantive argument explaining how the evidence does not support the trial court's findings. We address each alleged breach in turn.

1.

Jerry contends that the trial court correctly concluded that the "loss of KGS' FFL was a failure to carry out the duties owed by the directors to KGS and to Jerry Kesselring, and for this, there is liability," but incorrectly concluded that loss of the license could not be solely placed on Donald and Keith. We disagree.

The ATF investigation revealed substantial violations as far back as 1968. Donald and Keith were not officers and directors of KGS until 2009. The trial court acknowledged, "[t]hose who were responsible for the day-to-day management of KGS had a clear duty to resolve the ATF issues, as the business could not exist without the license. KGS directors and officers were put on notice of the possibility KGS could lose its Federal Firearm License ("FFL") for violations of ATF regulations and requires as early as 2005 and 2006."

The court found that "Donald Kesselring took very little part in attempting to rectify the problems with the ATF. Keith Kesselring did most of the work and he made significant efforts." Keith developed the KGS Compliance Plan required by the ATF in 2010. Keith "supplemented the Employee Handbook he had started for KGS with specific instructions to meet ATF requirements." "More careful attention to KGS' compliance with ATF regulations was part of the compliance plan, and KGS was required to file quarterly reports with the ATF on KGS's compliance progress." Keith located and identified many firearms on the "missing list" and these efforts continued even during the receivership in 2013.

At the same time, the family was dealing with Brad's death. Keith was the personal representative of Brad's estate. Keith was hospitalized in 2010 for surgery related to a brain tumor. The court concluded that Jerry was never told of the scope and nature of the ATF violations until after the ATF revoked KGS's license.

After the trial court concluded that Donald and Keith's efforts "were ineffective to accomplish the changes at KGS that were needed to keep the [ATF license]," it turned to the remedy. The court concluded that "[t]he value of KGS and its stock were significantly reduced following ATF's revocation of KGS' license by the need to liquidate compared to the value of an ongoing concern" and that the loss in value to the corporation was $5,079,673.61. After weighing the equities, the court made the following findings:

> 1.82   All three of the shareholders suffered significant losses as a result of the liquidation. As a general rule, recovery for a derivative action belongs to the corporation. A direct recovery to any individual stockholder is permitted under exceptional circumstances, as a result of a forced distribution of corporate assets, which would result in distribution in a way

different than the shareholders' ownership interests would direct. The court must determine whether, if recovery is awarded to a corporation, that would result in a shareholder receiving a portion thereof to which he is not entitled. If that is the case, a court of equity will look beyond the corporate award in the recovery to individual shareholders if it is appropriate.

1.83   All three shareholders have already received dividends divided up proportionately to the shareholder interest. They have all lost the business which provided to Donald and Keith their livelihood and which to all three of them represented a financial asset and a family history.

1.84   Jerry Kesselring did not act to actively assist the Corporation, he resisted service on the Board of Directors, and he demanded a buy-out of his interest at an initial value far greater than what it turned out to actually be. Jerry did not contribute in any material way to the loss of the ATF License. The equities balance out.

1.85   The loss of the Federal Firearms License (FFL) was not due to intentional, conspiratorial or reckless actions on the part of Keith Kesselring or Donald Kesselring. They did not intend for KGS to lose its FFL. They did not just turn a blind eye. Keith tried hard to fix it. The Court finds there was not a conspiracy to cheat Jerry by letting the license go away. The Court does not find there was any sort of intent to ignore the license problem or that Keith and Donald's actions were reckless. Their efforts were just insufficient.

1.86   The loss of license was a result of two generations of informal management of a highly lucrative business. The Court does not find that the Company was financially mismanaged, but was regulatorily mismanaged. The loss of the ATF License cannot be laid at the feet of Donald Kesselring and Keith Kesselring because of any actions they took, but instead it is a result of a business that never really ascended beyond its origins.

1.87   Donald Kesselring and Keith Kesselring did not gain specifically from their acts or failures to act and they obtained no personal advantage to the extent that equity should intervene to prevent them from receiving their share of the remainder of the funds in the Court Registry. Everybody suffered, and Donald and Keith suffered more directly than Jerry.

1.88   There is no showing that Donald Kesselring and Keith Kesselring acted in bad faith or with an improper motive. There is no indication that Donald Kesselring and Keith Kesselring did not make good faith management decisions on how to deal with the ATF license. They believed they were acting in the best interest of the Company.

> 1.89  All three shareholders suffered significant losses, all three lost business opportunities.  There is no basis to find that Donald Kesselring and Keith Kesselring are personally liable to KGS for the decisions they made and actions they took in an effort to comply with ATF regulations.

In finding of fact 1.88, the trial court found that Donald and Keith discharged their duties in good faith and in a manner that they reasonably believed to be in the interests of KGS.  RCW 23B.08.300(1)(a), (c).

Jerry specifically challenges the trial court's application of RCW 23B.08.300(1)(b), contending that the trial court improperly applied the business judgment rule to immunize Donald and Keith's decisions because Donald and Keith were incompetent by not exercising proper care, skill, and diligence.  To the contrary, the trial court did not cite the business judgment rule when determining whether Donald or Keith breached a duty under RCW 23B.08.300 or RCW 23B.08.420.  As the court's findings make clear, it considered the circumstances surrounding Donald and Keith's decisions, including the fact that they did not become directors or officers until 2009 and that the ATF violations went back as far as 1968.

Further, the court concluded that, while the loss of the license "was a failure to carry out the duties owed by the directors to KGS and to Jerry," that Donald and Keith should not be liable to Jerry for the breach.  We review the court's equitable remedy for abuse of discretion.  The court concluded that the regulatory mismanagement of KGS preceded Donald and Keith's time as officers and directors.  Keith made significant efforts to get KGS ATF complaint.  At the same time, Jerry resisted service on the Board of Directors, sought a buy-out, and filed for dissolution.  Because KGS lost its ATF license, each brother suffered significant losses.  But the court concluded that

Donald and Keith suffered more directly than Jerry because KGS was their livelihood. Accordingly, the court concluded that the equities did not warrant reallocating distributions in a different way than the shareholder's ownership interests dictated. Interlake Porsche, 45 Wn. App. at 520. Jerry has not demonstrated that this equitable remedy was based on untenable grounds. Therefore, the trial court did not abuse its discretion.

2.

Jerry contends that the trial court erred when it entered findings of fact 1.19 to 1.21 because underreporting KGS's inventory to the IRS required a restatement of inventory value and created additional tax liability for each shareholder. Jerry contends that the underreporting was the fault of KGS's corporate leadership and KGS sustained large tax losses as a result. We disagree.

The court made the following findings of fact:

1.19 Over the course of several years, the information management process employed at KGS managed by the various family members allowed its inventory value calculation to be substantially underreported. The actual inventory value was substantially larger than the inventory value that had been reported to the IRS on KGS's annual tax returns. Because the under-reported inventory resulted in the prior under-reporting of income to KGS, it was necessary to make an adjustment. Following Brad Kesselring's death, Jerry Kesselring alerted KGS management that the believed the inventory value was significantly under-reported. KGS hired CFO, Mel Call and conduct a new inventory valuation and obtained a restated inventory valuation as of December 31, 2009 of approximately eight million dollars. This was approximately five million dollars more than what had been reported in preceding years. This restatement of inventory value for KGS created additional significant tax liability for each of the shareholders.

1.20 The under-reporting of income had tax implications that required KGS to report the under-reported income in four equal installments for the tax years 2009, 2010, 2011, and 2012.

> 1.21 The actual inventory levels had remained essentially constant throughout the years from 2000 until 2013, but was under-reported up until the 2009 tax return was filed in September 2010.

The trial court also found:

> 1.69 The Corporation provided bonuses to Donald Kesselring and Keith Kesselring to help pay their additional deferral income taxes resulting from the restatement of inventory evaluation. Jerry Kesselring testified he did not have to pay the added assessed tax liability. He paid $500 for professional tax advice related to his assessed tax liability, he testified that he spent 562.2 hours on his own time trying to resolve this issue with the Internal Revenue Service. . . . Therefore, except for the $500 payment for tax advice, Jerry suffered no damages from KGS' need to complete the inventory restatement. There was no loss in the value due to the inventory valuation restatement.

The trial court found that the underreporting related to tax years 2000 through 2009 and the restated inventory valuation created "significant tax liability for each of the shareholders." As an S-Corporation, KGS did not pay taxes on its income; instead the reporting of taxable income passed through to the shareholders and it was the shareholder's responsibility to pay the required taxes. Jerry testified that he contested his tax obligation with the IRS and the IRS ruled that he was not liable for it; therefore, he did not incur any tax liability because of the restatement of inventory. Thus, the trial court did not err when it concluded as a matter of law that neither Jerry, nor KGS, suffered a loss from the undervalued inventory and subsequent tax liability.

3.

Jerry contends that the trial court erred when it entered findings of fact 1.22 to 1.24, 1.66 to 1.67, and 1.72 because Brad embezzled money, which resulted in a loss to KGS.

The court made the following findings of fact:

1.22   In the late summer or early fall of 2009 it came to light that Brad Kesselring had been taking substantial sums from KGS for his own purposes.  This theft came to light when Don Kesselring became award of financial difficulties and Jerry Kesselring was examining bank statements and corporate records and discovered financial discrepancies.

1.23   Brad was confronted about his theft by his brothers.  He returned about $130,000 but shortly after the theft was detected, Brad Kesselring committed suicide.  At the time of his death, there was still a large amount of unresolved and unreimbursed theft.  Following his death, it was determined that Brad Kesselring was the father of an infant child who stood to inherit Brad Kesselring's estate.

1.24   The attorneys representing Brad Kesselring's minor child negotiated a settlement with KGS to have his Estate's 18.889% ownership shares in KGS redeemed by the Corporation.  Because Brad's child was a minor, the settlement regarding this child was approved by the Probate Court in Skagit County.  The amount of Restitution determined to have been embezzled by Brad Kesselring and other financial claims KGS had against Brad, plus a Promissory Note from KGS to the Estate comprised the consideration for the redemption.  The redeemed shares were distributed pro-rata to Donald Kesselring, Keith Kesselring, and Jerry Kesselring, such that after this distribution Donald held 53.426%, and Keith and Jerry each held 23.287% of the shares.  The shareholders continued to hold those percentages of shares until the corporation was dissolved.

. . . .

1.66   With regard to the theft by Brad Kesselring, although their failure to detect and prevent the theft could implicate them in liability to the corporation, it would be inequitable to charge Donald Kesselring and Keith Kesselring with Brad Kesselring's theft.  Donald Kesselring and Keith Kesselring had no reason not to believe Brad Kesselring or trust him.  Even though Brad Kesselring embezzled funds from the Corporation, it still remained profitable.  In the settlement with Brad Kesselring's estate, the known losses to the Corporation were recovered.

1.67   Because of the way inventory was purchased and cash flowed through the business, it would be pretty easy for someone to conceal theft like the kind Brad Kesselring committed.  The running of the Company as a family business was not so much of a deviation from proper practice as to justify the imposition of liability in this case.  There was no dereliction of duty by Keith Kesselring and Donald Kesselring with respect to Brad's embezzlement.  There was no obligation for them to prevent Brad's

embezzlement because it was something that Brad did entirely on his own, and it was outside of their knowledge and their doing.

The most relevant finding of fact is that the trial court found "[i]n the settlement with Brad Kesselring's estate, the known losses to the Corporation were recovered." In Senn, this court held that "officers and directors have an affirmative duty to be aware of the affairs of the companies they serve and that they can be held liable for activities of other officers and directors which they reasonably should know about." Senn, 74 Wn. App. at 415. If Donald and Keith breached their duty to be aware of KGS's affairs and, because of the breach, reasonably should have known about Brad's embezzlement, then Donald and Keith may be liable. As discussed earlier, breach of a duty is only the first step to proving liability; Jerry still bears the burden of showing that the breach was a proximate cause of the losses sustained.

Here, Jerry failed to prove by a preponderance of evidence, that Brad's embezzlement caused him or KGS any losses.[5] KGS reached a settlement agreement with Brad's estate and the fairness of terms have not been raised on appeal. Thus, even if the evidence supports a breach of duty and the trial court erred, Jerry has failed to establish that the settlement did not remedy the loss to KGS.

### 4.

Finally, Jerry contends that KGS's corporate management paid extensive personal expenses from corporate resources and excessive compensation and bonuses.

---

[5] Further, finding of fact 1.18 indicates that after Brad's death and the discovery of his embezzlement, "changes were made which included employment of a non-family Chief Financial Officer to oversee financial matters, the institution of new accounting procedures, and new inventory reporting procedures, ATF compliance training for employees, the institution of employee manuals and security measures."

Under Washington law, the board of directors determines salaries and bonuses. RCW 23B.08.110 indicates "[u]nless the articles of incorporation or bylaws provide otherwise, the board of directors may fix the compensation of directors." Accordingly, the trial court concluded as a matter of law that "Donald Kesselring and Keith Kesselring as directors and officers of the Corporation had the legal right to establish salaries and bonuses and other compensation for officers and directors." Since RCW 23B.08.110 provides discretion to the board of directors, the trial court did not err when it found Donald and Keith did not breach their duty to KGS when setting the amount of bonuses and salaries.

The trial court concluded that Jerry failed to meet his burden of showing that the money taken from registers or charged to credit cards by Ronald, Keith, and Donald was not paid back.[6]

The trial court entered the following findings of fact:

> 1.50   In view of the established policy of the Company for repayment of personal advances, the Court does not have sufficient evidence or contravening evidence to establish that the amounts were not repaid as provided by the Company policy. The sums may not have been paid back, but the evidence presented would require the Court to speculate that they were not.

> 1.51   The evidence is that some personal expenditures paid by KGS for Ronald Kesselring, Donald Kesselring, and Keith Kesselring were de minimis and there is no evidence that the payments, even if not repaid, caused any loss to Jerry.

Regardless of whether Donald and Keith breached their duty of care and duty of loyalty by using KGS's money for personal expenses, the trial court found that Jerry failed to

---

[6] Findings of fact 1.63 and 1.64 discuss the interest free loans that Donald received from KGS and the trial court entered a judgment against Donald to repay the remaining balance on the unauthorized loans at 12 percent interest.

carry his burden because the trial court would have to speculate which funds were not paid back, in light of the company policy allowing these types of advances. Additionally, Jerry failed to establish causation because his expert's valuation did not account for any loss due to self-dealing, rather the discussion related to the difference between KGS's 2009 valuation as a going concern versus the liquidation value in 2013.

"Directors and officers stand in a fiduciary relation to the corporation they serve and are not permitted to retain any personal profit or advantage gleaned 'on the side.'" Interlake, 45 Wn. App. at 508-09. "Once the breach of a fiduciary duty has been established, the plaintiff must prove the damage resulting from the breach." Interlake, 45 Wn. App. at 510. In Interlake, the trial court found that $534,797 in corporate funds had been used for certain expenses and that substantial expenditures were for Bucholz's personal benefit. 45 Wn. App. at 510. The trial court determined that Bucholz was liable to the corporation for the total amount because it placed the burden of proving the legitimate nature of those expenses on Bucholz. Interlake, 45 Wn. App. at 510. On appeal, the court rejected the contention that Bucholz, as the corporation's sole record keeper, had the burden to prove that the expenditures were made in good faith. Interlake, 45 Wn. App. at 510.

"Where a transaction involves self-dealing or evidence of personal benefit is shown, then the burden shifts to the fiduciary to show good faith." Interlake, 45 Wn. App. at 512. The showing of self-dealing or personal benefit must be shown for each complained of transaction. Interlake, 45 Wn. App. at 512. On appeal, Jerry does not explain how substantial evidence supports a finding different from the trial court's finding. Instead, Jerry complains generally, for instance, "Ron received $95,000 in

payments beyond what $3,500 per month would have generated" or "Brad bought a tractor and a truck with KGS funds."

The trial court, however, made extensive findings about the damages Jerry complains of, finding that the charges were either legitimate business expenses, consistent with company policy, de minimis, or that Jerry failed to prove the amounts were not paid back.

The trial court found:

1.47    There were claims made by Jerry Kesselring against Keith Kesselring and Donald Kesselring as individuals and derivative claims for the improper use of funds, excessive salaries and bonuses, removal of cash and assets, theft, or embezzlement, and conspiracy to defraud.  The evidence does show that on occasion Donald and Keith did pay for personal expense from KGS funds, allowed Ronald Kesselring's personal expenses to be paid by KGS through the use of KGS credit accounts, and used KGS credit accounts for their personal use.  The weight of direct testimony is that the personal expenses were paid back to the Corporation or were de minimis if they were not paid back.  There was no evidence submitted to establish theft, embezzlement or conspiracy to defraud.

1.48    Witnesses who were actively involved in day-to-day operations of KGS testified it had always been the policy of the Company that Ronald, Keith and Donald would pay back the Company for personal expenses charged to Company accounts.

1.49    There was direct evidence and notations on credit card statements and elsewhere stating Ronald Kesselring, Donald Kesselring, and Keith Kesselring paid back sums taken by them for their personal use and expenses.  There were also account documents that did not have notations confirming that the use of KGS money and credit for personal expenses had been repaid by Ronald Kesselring, Donald Kesselring and Keith Kesselring.  The Court finds that the lack of notations does not mean that the sums were not repaid, only that it was not written down.

. . . .

1.52    A truck and tractor were purchased by Brad Kesselring for his personal use using corporate funds.  The repayment to KGS for the cost of the truck was paid back by the Estate of Brad Kesselring as part of the settlement between KGS and the Estate for the redemption of Brad

Kesselring's shares from his Estate and it all balanced out. This was not a significant amount and there is no showing of any damage to Jerry Kesselring related to the purchase of the truck.

1.53   The tractor purchase by Brad Kesselring with KGS funds was converted to a KGS asset and was later disposed of. This was not a significant amount and there is no showing of any damage to Jerry Kesselring related to the purchase of the truck.

1.54   Brad Kesselring used KGS funds and credit to purchase other personal items, and allowed NSF banking fees to be charged to KGS prior to his death. These charges were accounted for and made part of the negotiations between the Estate of Brad Kesselring and KGS to redeem the shares of Brad Kesselring from the Brad Kesselring Estate and to discharge Brad's financial obligations to KGS by reason of his embezzlement and other charges to the Company.

1.55   The Company through Keith Kesselring made various charitable donations of Company funds for advertising purposes. Keith Kesselring used KGS funds for such donations in his own name and the Company name. This was an accepted and appropriate business practice, and these were appropriate KGS business expenses.

1.56   A payment was made to Getty Images for use of an image for which Getty Images had a copyright and which KGS use for promotional purposes. The image was used by mistake and provided a benefit to KGS. The payment for use of the product in Company advertising was an appropriate business expense and was not a defalcation or mismanagement or theft.

1.57   KGS paid for personal 2009 and 2010 tax return accounting services for Keith Kesselring related to the inventory value restatement. This was an expense incurred by Keith Kesselring for KGS' under-reported inventory and was an appropriate business expense because KGS provided money to Donald Kesselring and Keith Kesselring to help pay their personal income tax liabilities related to the restatement of inventory valuation.

1.58   Jerry Kesselring claimed that cash had been taken from the Company by Keith Kesselring and Donald Kesselring. At times they did take cash from the business, up to $1,000 at a time. There was testimony by employees best placed to know that any cash or other property of the Corporation that was taken and used for a personal expense was paid back as a matter of Company policy. There is no evidence to show that the use of KGS money by Donald Kesselring or Keith Kesselring for their

personal use created any injury or harm to Jerry Kesselring or affected his interest in the Company.

1.59   Ronald Kesselring made various charges on the Company credit cards for his personal expenses during the time he was working for the Company, and following his retirement from active management.  There was a longstanding company practice of repayment of personal expenses charged to the company accounts by the Kesselring Family members.  There was no showing that these items were not reimbursed by Ronald Kesselring according to long-standing company practice.  Further there was no showing that this impacted Jerry Kesselring's interest in the Company.

1.60   KGS made payments to Sjostrom Law Office.  Some of these payments were made during the time when Ronald Kesselring was in charge of the Company.  The evidence established that some of these charges were legitimate business expense for representation in the Hoines lawsuit against KGS and some were for an easement regarding Ronald Kesselring's property.  There is no evidence that this money was not paid back consistent with existing company reimbursement policy.  There is no evidence that Jerry Kesselring's interest in the Company was reduced by this practice.

1.61   There were a number of other expenses paid by KGS for Ronald Kesselring's residence: the Dahlman pump expense, the Garrett's Grass expense, the Skagit Farms expense.  These are all items that are in the same category of personal expenditures allowed to be paid on behalf of members of the Corporation, which were then reimbursed.  There is no evidence that these expenses were not reimbursed.  There was testimony that this was the policy and that is what was done.

1.62   Evidence was presented of a charge on a KGS credit card account for "Onboard Cruise".  It was speculated that someone at KGS may have taken a cruise.  There was no evidence that either Keith Kesselring or Donald Kesselring or anyone else at KGS took a cruise, but Ronald Kesselring took cruises.  There was evidence that the charge associated with that notation on credit card was for a firearm accessory vendor for KGS.  If someone at KGS took a cruise paid for by KGS, there is no evidence that KGS was not paid back for that expense.  The Court would have to speculate as to the nature of the charge, so no evidence supports a claim against Donald Kesselring or Keith Kesselring for this charge.

Jerry challenges these findings of fact as "[a] clear example of how the trial court tolerated lackadaisical standards for use of KGS corporate resources [] in its findings as

to Ron Kesselring." The trial court addressed the challenged expenses and found many of them consistent with company practice or repaid by Ronald, Keith, and Donald. On appeal, Jerry has not provided argument that these transactions were self-dealing and therefore cannot show that KGS suffered a loss due to these charges.

The trial court did not err when it concluded that Jerry failed to carry his burden to prove the use of funds was self-dealing or a proximate cause of KGS's loss.

### III.

Jerry next contends that the trial court erred when it did not allow Jerry to recover personally for the special harm of his personal time spent defeating his tax liability with the IRS. Keith responds that the trial court correctly rejected Jerry's claimed damages, as a matter of law, because there was no evidence that he missed work or incurred financial liability other than the $500 paid for a tax adviser.

Jerry calculated that he spent 562.2 hours preparing his case with the IRS, using his rate of pay at Mod Pizza—$60 per hour—for a total special harm of $31,572.00. Below, Donald and Keith cited to Gale v. City of Seattle, No. 70212-2-I (Wash. Ct. App. Feb.10, 2014) (unpublished), where Gale, a pro se litigant, requested attorney fees under RCW 42.56.550(4) and this court concluded that since a pro se litigant does not incur attorney fees, he cannot recover those fees. Donald and Keith analogized to Gale, contending that Jerry cannot recover for time spent preparing his IRS case. On appeal, Jerry contends that Leen allows a pro se attorney to recover attorney fees because he loses valuable time from his law practice while representing himself and similarly, Jerry lost valuable time he could have spent on other business ventures.

In its oral ruling, the trial court concluded that time spent defeating the tax liability was not of the same character as time lost in tort cases and here, the court heard no testimony that Jerry missed work to challenge his tax liability. In <u>Leen</u>, the court allowed a pro se attorney to recover at his hourly rate for time spent preparing his case because "lawyers who represent themselves must take time from their practices to prepare and appear as would any other lawyer." <u>Leen v. Demopolis</u>, 62 Wn. App. 473, 486-87, 815 P.2d 269 (1991). Since Jerry did not miss work to prepare his case, <u>Leen</u> is not an applicable standard and the trial court did not err when it determined the damages were not recoverable without evidence that Jerry missed work.

We affirm.[7]

_____
Mann, C.J.

WE CONCUR:

_____        _____
Chun, J.                                Dwyer, J.

---

[7] Since we find that Jerry did not prevail below or on appeal, we do not reach the issue of attorney fees. The respondents did not request their fees on appeal.